**GLANCY PRONGAY & MURRAY LLP**
Lesley F. Portnoy
230 Park Ave., Suite 530
New York, New York 10169
Telephone: (212) 682-5340
Facsimile: (212) 884-0988
Email: lportnoy@glancylaw.com

Ex Kano S. Sams II
1925 Century Park East, Suite 2100
Los Angeles, CA 90067
Telephone: (310) 201-9150
Facsimile: (310) 201-9160
Email: esams@glancylaw.com

**ROBBINS ARROYO LLP**
Stephen J. Oddo
5040 Shoreham Place
San Diego, CA 92122
Telephone: (619) 525-3990
Facsimile: (619) 525-3991
Email: soddo@robbinsarroyo.com
gdelgaizo@robbinsarroyo.com

*Co-Lead Counsel for Lead Plaintiffs and the Class*

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| JIAXIANG WEI, Individually and On Behalf of All Others Similarly Situated,<br><br>Plaintiff,<br><br>v.<br><br>PINDUODUO INC., ZHENG HUANG, TIAN XU, LEI CHEN, ZHENWEI ZHANG, JUNYUN XIAO, HAIFENG LIN, ZHEN ZHANG, NANPENG SHEN, and JIANMING YU,<br><br>Defendants. | CASE No.: 1:18-cv-07625-PKC<br><br><br>**CONSOLIDATED AMENDED CLASS ACTION COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS**<br><br>**CLASS ACTION** |

Lead Plaintiffs Kerry Asay and Johan Johan ("Lead Plaintiffs"), individually and on behalf of all other persons similarly situated, by their undersigned attorneys, for their Consolidated Class Action Complaint for Violations of the Federal Securities Laws ("Complaint") against Pinduoduo Inc. ("Pinduoduo" or the "Company") and the other defendants named herein (collectively, "Defendants"), allege the following based upon personal knowledge as to their own acts, and upon information and belief as to all other matters, based upon, inter alia, the investigation conducted their counsel.  Lead Plaintiffs believe that further substantial evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

<u>**NATURE OF THE ACTION**</u>

1.      This is a federal securities class action on behalf of a class consisting of all persons or entities, other than Defendants (defined below), who purchased or otherwise acquired securities of Pinduoduo: (1) pursuant and/or traceable to the Company's July 26, 2018 initial public offering ("IPO" or the "Offering"), seeking to recover damages for violations of Sections 11 and 15 of the Securities Act of 1933 ("Securities Act"); and (2) on the open market between July 26, 2018 and August 1, 2018, both dates inclusive (the "Class Period"), seeking to recover damages for violations of Sections 10(b) and 20(a) of the Securities Exchange Act of 1934 (the "Exchange Act") and Securities and Exchange Commission ("SEC") Rule 10b-5 promulgated thereunder.

2.      In June 2018, Pinduoduo – an online marketplace similar to Amazon – surprised investors by announcing that it would launch an IPO.  Only three years old, Pinduoduo had never earned a profit.  Moreover, though the Company operates only in the People's Republic of China ("PRC"), Pinduoduo sought to hold its IPO on the U.S. markets – seeking investments from a

population that was not familiar with its products or platform. Indeed, the IPO came as a complete surprise even to senior Pinduoduo employees.

3.      The IPO's Registration Statement, Prospectus, and Offering Documents (collectively "Registration Statement" or "Offering Documents")  and Defendants' other public statements told a fairy-tale story.  Unlike its competitors, Pinduoduo had managed to grow organically, using social media, rather than through expensive advertising campaigns.  Its costs to acquire users were minimal – only about $3 per user.  Moreover, Defendants firmly rejected the scattered allegations – levelled against most Chinese online marketplaces – that Pinduoduo promoted or permitted the sale of counterfeit products.  Indeed, the Registration Statement boasted of the many steps Pinduoduo was taking to protect intellectual property on its platform. Defendants also pointed to Pinduoduo's 10-for-1 policy, through which Pinduoduo purportedly fined sellers of counterfeit products ten times the value of all sales of counterfeit products and distributed the proceeds to customers.

4.      Pinduoduo launched its IPO on July 26, 2018, to great fanfare.  But Pinduoduo's fairy-tale story was just that.  On Saturday July 28, 2018, Skyworth Group Co. Ltd. ("Skyworth"), one of China's three largest sellers of televisions, published a demand that Pinduoduo take down all Skyworth-counterfeit products from its platform.  Following Skyworth's notice, a host of intellectual-property holders – from mobile phone sellers to a children's book author – complained that Pinduoduo hosted counterfeits of their products. Following a report that aired on July 30, 2018 by the China Central Television, or CCTV, which often serves to present the Chinese central government's position, China's powerful State Administration for Market Regulation (the "SAMR"), on August 1 ordered an investigation into Pinduoduo's practices.

5.      These revelations caused Pinduoduo's stock price to collapse, falling from a closing price of $24.60/American Depository Shares ("ADS") before the Skyworth revelation and CCTV report on July 27 to $22.50/ADS on July 30, the next trading day after these disclosures.   Pinduoduo's stock price fell again from a close of $22.59/ADS on July 30 to $20.31/ADS on August 1.  Pinduoduo's stock price yet again fell from $19.66/ADS on August 2 to $19.07/ADS on August 3.

6.      But counterfeit products were not the only issue Pinduoduo faced.  Pinduoduo's Q2 2018 ended on June 30, 2018.  According to several employees, Pinduoduo had access to full financial reports for this period on or before July 14, 2018 – well before Pinduoduo's July 26 IPO.  Yet, Pinduoduo's Registration Statement did not disclose these financial results.

7.      On August 30, 2018, Pinduoduo disclosed its Q2 2018 earnings.   Pinduoduo's marketing expenses rocketed from RMB1.2 billion in Q1 2018 to nearly RMB3 billion in Q2 2018.  Pinduoduo had little to show for its marketing efforts, growing its user base by roughly as much in Q2 as it had in Q1.   Thus, Pinduoduo's per-customer acquisition cost increased from RMB20 ($3) to RMB64 ($10) – dangerously high for a company that does not generate much revenue from each customer.

8.      As the results leaked to the market during and before trading on August 30, Pinduoduo's stock price fell from its previous close of $21.15/ADS to close at $17.99/ADS, further damaging investors.

## JURISDICTION AND VENUE

9.      The claims asserted herein arise under §§10(b) and 20(a) of the Exchange Act (15 U.S.C. §§78j(b) and 78(a)) and SEC Rule 10b-5 promulgated thereunder (17 C.F.R. §240.10b-5), and §§11 and 15 of the Securities Act (15 U.S.C. §§ 77k and 77o).

10.     Jurisdiction is conferred by §27 of the Exchange Act (15 U.S.C. §77aa) and §22 of the Securities Act (15 U.S.C. §77v).  This Court has jurisdiction over the subject matter of this action under 28 U.S.C. §1331.

11.     Venue is proper in this District pursuant to §27 of the Exchange Act, §22 of the Securities Act, and 28 U.S.C. §1391(b).

12.     In connection with the acts, conduct, and other wrongs alleged in this Complaint, Defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including, but not limited to, the United States mail, interstate telephone communications, and the facilities of the national securities exchange.

## PARTIES

13.     Lead Plaintiffs Kerry Asay and Johan Johan purchased Pinduoduo securities at artificially-inflated prices during the Class Period and suffered damages upon the revelation of the alleged corrective disclosures.  Plaintiffs previously filed with the Court their certifications pursuant to the Private Securities Litigation Reform Act of 1995, which are incorporated by reference herein.

14.     Defendant Pinduoduo is incorporated in the Cayman Islands, with principal executive offices located at 28/F, No. 533 Loushanguan Road, Changning District, Shanghai, 200051.  Pinduoduo's ADS trade on the NASDAQ under the ticker symbol "PDD."

15.     Defendant Zheng (Colin) Huang ("Huang") is a founder of Pinduoduo and has served at all relevant times as the Company's Chief Executive Officer ("CEO") and Chairman of the Board of Directors.   CEO Huang reviewed, contributed to drafting, and signed the Registration Statement in connection with the IPO.  Huang attended the prestigious computer science program at Zhejiang University, then obtained a Master's degree from the University of

Wisconsin.  He then went to work for Google in China, amassing a small fortune through stock options as Google's stock price rocketed before leaving in 2006.  He then founded three successive start-ups, including Pinduoduo.

16.     Defendant Tian Xu ("Xu") has served at all relevant times as the Company's Principal Financial and Accounting Officer.  Xu reviewed, contributed to drafting, and signed the Registration Statement in connection with the IPO.  Xu joined Pinduoduo in June 2018.  Before Pinduoduo, Xu served as Head of the Emerging Business Group at the colossal Chinese company Baidu, Inc.

17.     Defendant Lei Chen ("Chen") was a Director of Pinduoduo at the time of the IPO. Chen reviewed, contributed to and signed the Registration Statement.

18.     Defendant Zhenwei Zheng ("Zheng") was a Director of Pinduoduo at the time of the IPO. Zheng reviewed, contributed to and signed the Registration Statement.

19.     Defendant Junyun Xiao ("Xiao") was a Director of Pinduoduo at the time of the IPO. Xiao reviewed, contributed to and signed the Registration Statement.

20.     Defendant Haifeng Lin ("Lin") has served at all relevant times as a Director of Pinduoduo. Lin reviewed, contributed to and signed the Registration Statement.

21.     Defendant Zhen Zhang ("Zhang') has served at all relevant times as a Director of Pinduoduo. Zhang reviewed, contributed to and signed the Registration Statement.

22.     Defendant Nanpeng Shen ("Shen") has served at all relevant times as a Director of Pinduoduo. Shen reviewed, contributed to and signed the Registration Statement.

23.     Defendant Jianming Yu ("Yu") was a Director of Pinduoduo at the time of the IPO. Yu reviewed, contributed to and signed the Registration Statement.

24.     The Defendants referenced above in ¶¶15-23 are sometimes referred to herein as the "Individual Defendants."

25.     The Individual Defendants possessed the power and authority to control the contents of Pinduoduo's SEC filings, press releases, and other market communications. The Individual Defendants were provided with copies of the Company's SEC filings and press releases alleged herein to be misleading prior to, or shortly after, their issuance, and had the ability and opportunity to prevent their issuance or to cause them to be corrected. Because of their positions with the Company, and their access to material information available to them but not to the public, the Individual Defendants knew that the adverse facts specified herein had not been disclosed to, and were being concealed from, the public, and that the positive representations being made were then materially false and misleading. The Individual Defendants are liable for the false statements and omissions pled herein.

26.     Pinduoduo and the Individual Defendants are referred to herein as "Defendants."

## SUBSTANTIVE ALLEGATIONS

### Background

27.     Defendant Huang founded Pinduoduo in 2015. It is the fastest growing app in the history of China. By June 30, 2018, there were 344 million active buyers on its platform, or more than the total U.S. population.

28.     Pinduoduo initially earned revenue by conducting transactions on its platform as a principal. By early 2017, however, the Company earned all of its revenue simply by connecting buyers with sellers as a broker. At that time, Pinduoduo earned money through broker commissions. But by 2018, it changed its business model again, switching to earning

substantially all of its revenue from merchant advertisements.  Thus, at the time of the IPO, merchants were responsible for selling and sourcing their own products.

29.     Pinduoduo got its start through sales of discounted food, which was usual among online marketplaces.  But to avoid low margins, Pinduoduo, with some success, diversified to other products, from appliances, to gadgets, to personal care items.

30.     Pinduoduo's name roughly translates to "shop more together."  It encourages customers to engage with each other through social media as they shop.  When customers share Pinduoduo's product information on social networks like WeChat (a Chinese messaging, social media, and mobile payment app) and QQ (a Chinese messaging software service), they can invite contacts to form a group to get a lower price for their purchase.  The group-selling, or "team purchase," model allows customers to coordinate with each other on social media and then place group orders on Pinduoduo.

31.     Pinduoduo targets price-conscious customers who live in underserved areas and earn lower incomes, to whom Pinduoduo offers lower prices.

32.     Pinduoduo has had little success attracting established brands to its platform.

**Pinduoduo faces fierce competition**

33.     Competition in the technology field in China is ferocious.  In a recent book, Kai-Fu Lee, a principal of a Chinese venture-capital fund who had previously founded *both* Microsoft and Google's Chinese operations, characterized the Chinese internet sector as far more competitive than even Silicon Valley, with employees expected to work longer hours, and where companies behave far more ruthlessly.  Moreover, according to Mr. Lee, China's "gladiatorial" companies rapidly copy and improve upon each successful innovation.  Thus, a company that pioneers a new business model will quickly find itself competing against many other adopters.

Only a few of the competitors will survive, with the vast majority going out of business. This model leaves very little time for a company to execute on its ideas, essentially mandating explosive growth for survival.

34.    Pinduoduo inhabits in this cut-throat world. Pinduoduo's rise prompted Alibaba subsidiary Taobao to develop a new app that likewise targets relatively less-affluent customers who place smaller orders. Alibaba's resources vastly exceed those of Pinduoduo. Thus, it poses a potent challenge.

**Pinduoduo conducts its IPO**

35.    On July 24, 2018, Pinduoduo filed its Registration Statement on Form F-1/A with the SEC. The Registration Statement was declared effective on July 25, 2018.

36.    On July 26, 2018, Pinduoduo sold 85.6 million ADSs at a price of $19.00. The Company also sold 8.3 million ADSs to cover underwriter over-allotments, raising net proceeds of $1.73 billion.

**Counterfeit Goods Proliferate on Pinduoduo's Platform**

37.    China is a massively unequal, middle-income country. Even as the skyscrapers rise in Shanghai, Beijing, and China's other ultramodern cities, a billion Chinese citizens in remote locations live on modest annual incomes of significantly less than $10,000 USD. These citizens have a difficult time paying for branded products.

38.    In recent years, Chinese online marketplaces have been dogged by allegations that they facilitated the sale of counterfeit products. These allegations have hit the majority of Pinduoduo's competitors, including the fearsome Alibaba and JD.com. Rumors persisted that Pinduoduo was an especially bad actor, in part because it had relatively less-affluent customers.

Pinduoduo likewise allowed the sale of counterfeit goods, but it was never a central player in the controversy because it had a low media profile.

39.     In recent years, however, the Chinese government has engaged in a very public crackdown on the sale of counterfeit products on online marketplaces.  For instance:

    a.  In 2013, China amended its *Law on the Protection of Consumer Rights and Interests* to strengthen protections relating to online sales;

    b.  In 2014, the SAMR's predecessor issued its binding *Measures on the Administration of Online Transactions*, which, among other things, imposed legal obligations on e-commerce platform operators such as Pinduoduo to protect consumers' rights, establish internal control mechanisms to monitor violations of the law, and take measures to protect registered trademarks, enterprise names and other rights and combat infringement of intellectual property rights and unfair competition;

    c.  In 2015, the SAMR's predecessor also published its binding Comments on *Strengthening and Regulating the Sample Inspection of Commodity Quality in Online Transactions*, clarifying that the platform operator must monitor the quality of products sold on its platform and terminate offerings that damage consumers' rights; and

    d.  In March 2017, the Chinese Government issued its binding *Opinions on Strengthening the Work of Combating Infringement of Intellectual Property Rights and Fake and Low-quality Commodities under the New Situation*, ordering that e-commerce platform operators strengthen their review of online vendors' qualifications.

40.     The Chinese government had announced further action specifically targeted to online marketplaces like Pinduoduo.  In June 2016, the Chinese government posted a draft of its *E-commerce Law*, which would, among other things, impose liability on online platforms for counterfeit sales if the platform knew, or should have known, about the counterfeiting.

41.     The Chinese government implemented and enforced its measure, taking concrete actions to address counterfeiting:

a.   In 2015, the SAMR's predecessor touted its "Special Mission" of fighting counterfeits;

b.   In October 2017, the SAMR's predecessor disclosed that during the first half of 2017, it had handled 25,000 counterfeiting cases and assessed RMB240 million in fines;

c.   In March 2018, the Chinese state-run propaganda newspaper *Global Times* ran a piece titled "China vows to crack down on fake, inferior goods" flagging the increasing number of consumer complaints about counterfeit products and quoting the head of the responsible agency's vow to "continue to step up efforts in quality supervision and law enforcement to protect consumer rights this year;"

d.   In May 2018, the Chinese government reported on Operation Thunder, a pilot program in Zhejiang Province, where Alibaba is headquartered, aimed at remediating online intellectual property infringement and counterfeiting;

e.   In June 2018, the SAMR issued an action plan formulated with Chinese police authorities titled 2018 Internet Market Supervision, which aimed to "fight against illegal acts such as online counterfeit infringement, orders and credit forgery, false advertising, and so on, and to implement platform responsibility;" and

     f.   On July 9, 2018, the Chinese Supreme Court's Grand Justice of the Second Rank Ms. Tao Kaiyuan, was quoted as saying that "[We] should severely crack down on dishonest trademark parasites, and counterfeit hitchhiking, and further purify the market competition environment."

42.    Indeed, Pinduoduo's major competitors have taken steps to crack down on counterfeit products.  As far back as January 2017, Alibaba had over 2,000 full time employees responsible for combating counterfeits, whose efforts are supplemented by 5,000 volunteers. Alibaba also sues merchants who sell counterfeit products on its platform.  Between April and June 2017, Alibaba produced tips to the Zhejiang government leading to the arrests of 332 suspects and seizure of fake goods valued at RMB1.43 billion.[1] Alibaba also uses image-recognition technology to identify counterfeit products.[2]  Thus, sellers must hide logos, alerting customers that the item is counterfeit.

43.    JD.com employs a "source tracing inspection team" that physically visits its merchants' factories to ensure they are legitimate production facilities.

44.    To assuage these background rumors, Pinduoduo sought to distinguish itself from its competitors by purportedly adopting, and publicly touting, strict anti-counterfeit measures.

45.    Pinduoduo annually publishes a report on its efforts to fight counterfeit goods. Pinduoduo's 2017 annual report, published on February 1, 2018, prominently touted its 10-for-1 program.  Pinduoduo claimed that under that program, it would fine any counterfeiter ten times

---

[1]    Adam Najberg, January 4, 2017, Alibaba Breaks New Legal Ground in China, Sues Alleged Counterfeit Sellers, available at https://www.alizila.com/alibaba-sues-counterfeit-seller-in-china/.

[2]    Lim Yan Liang, Straits Times, January 16, 2019, available at https://www.straitstimes.com/asia/fake-goods-weeded-out-successfully-on-taobao-alibaba.

the value of all that counterfeiter's sales of all counterfeit products, and return the proceeds to aggrieved customers.

46.    Yet, these vaunted anti-counterfeit measures either went unenforced or were easily circumvented.

47.    For instance, Former Employee ("FE") 1 was a Quality Control Associate in Pinduoduo's Quality Control Division from July 2016 through March 2018.  Each Quality Control Associate made sample purchases to spot-check quality and whether the item was a counterfeit.  Each Quality Control Associate could only spot-check 30 items per day.  Yet, through the entirety of FE1's tenure, there were at all times only about seven Quality Control Associates for the entirety of Pinduoduo, compared to the several thousand Alibaba employs. Thus, these sources could only spot-check about 210 items a day.  With about 77 working days in a quarter (including Saturdays and holidays), this means that Pinduoduo could quality-control check less than 32,500 orders in the first half of 2018, or a tiny fraction of the 3.2 billion orders placed during that period.

48.    Additionally, according to Industry Professional ("IP") 1, the former Chairman of a former Pinduoduo competitor that later was merged into Pinduoduo, after Alibaba was similarly accused of counterfeiting in January 2015, it removed a host of merchants it suspected of counterfeiting from its platform, including many small-scale merchants from its platforms. Many of the merchants rejected by Alibaba sold on Pinduoduo instead because of the latter's lax registration requirements:

| Merchant Registration Requirements | | |
| --- | --- | --- |
| Pinduoduo | Taobao (Alibaba) | Tmall (Alibaba) |
| 1.  Upload personal ID or corporate license | 1. Register Taobao account 2. Choose the store | 1. Application 2. Prepare credentials materials |

| | type (individual or corporate)<br>3. Verify through Alipay<br>4. Verify through Taobao<br>5. Store set-up | 3. Tmall verification<br>4. Training and test |
|---|---|---|

49.     Moreover, Pinduoduo rarely actually followed the checks it claimed it followed. For example, Pinduoduo boasted in the Registration Statement that merchants must obtain brands' authorizations to sell their products.  In fact, during the entirety of the tenure of FE2, a Pinduoduo Operations Specialist employed from May 2016 through October 2017, Pinduoduo "turned a blind eye" to counterfeit products.  Indeed, Pinduoduo conducted its "inspection" of the authorizations using automated processes that allowed merchants to sell goods using authorizations that were not even from the brand itself.  On August 1, 2018, the China News Service, a national news agency owned by the Chinese central government reported that one of its journalists had set up an account to sell baby powdered milk using a PRC ID that he downloaded from the internet.  With no further screening, he was able to sell Enfakid-branded baby powdered milk, without providing any proof that it was authorized by its manufacturer, Mead Johnson.  The reporter copied the pictures and text in the product's Taobao listing – but not the price, which it cut by half to RMB60, or less than $10.  Thus, contrary to the Registration Statement, Pinduoduo did not proactively verify that the brands had authorized merchants' sales.

50.     Once they were registered, Pinduoduo allowed merchants to sell counterfeit products at length.  Merchant ("M") 1, the Legal Representative of a former Pinduoduo merchant, sold more than RMB200,000 in product from a Japanese brand by registering to sell the product using a "certification" from an unrelated Japanese agency.  Likewise, M2, the legal representative of a merchant on Pinduoduo, complained that a merchant had stolen M2's

credentials and used them to sell unauthorized products under the brand name of an unrelated company, Jiannanchun.  When M2 complained, Pinduoduo deregistered M2 from the platform and seized its funds, but did nothing to Jiannanchun.

51.     Even when Pinduoduo obtained irrefutable evidence that merchants were selling counterfeit products, Pinduoduo punished them with meaningless slaps on the wrist.   For example, M3, the legal representative of a former Pinduoduo merchant, boasted that M3 had registered to sell counterfeit products on Pinduoduo in 2016 because of its loose vetting process, and was caught in May 2017.  M3 readily admitted that M3 had sold counterfeit products, and that M3 should have been fined by Pinduoduo ten times the value of its sales of counterfeit goods, or RMB800,000.  Instead, Pinduoduo returned 70% of the sales proceeds to M3, meaning that Pinduoduo assessed a fine of a mere RMB24,000 – or 3% of the fine it claimed its policy required it to assess.  Through negotiations with Pinduoduo's lawyers, M3 understood that all merchants who were caught selling counterfeit items received the same or similar settlement offers.[3]

52.     Pinduoduo's failure to crack down on counterfeiters created substantial work for its employees.  M6 was a government-affairs employee who worked at Pinduoduo in Shanghai from October 2016 through August 2018.  Pinduoduo's platform's compliance with legal requirements was so shoddy that one of the three tasks that consumed M6's time was quietly settling complaints that could seriously damage Pinduoduo's reputation.[4]

---

[3]     M4, a merchant whose account Pinduoduo froze in July 2017, and M5, a merchant who was caught engaging in click farming at the end of 2016, report that Pinduoduo offered settlements through which they would recover at least 50% of their sales of counterfeit products. M5 added that Pinduoduo had told M5 to engage in click farming to boost the reputation of M5.

[4]     A common work schedule in the Chinese internet industry is called "996" – work from 9 a.m. to 9 p.m. six days a week, or 72 hours a week.  According to M6, Pinduoduo required an even more intense work schedule.

53.     Indeed, the majority of products in certain categories sold on Pinduoduo was counterfeit.  On July 30, 2018, Tianfeng Securities, a large Chinese brokerage company with recognized expertise in fintech and artificial intelligence, analyzed the sales of the top 100 household appliances on Pinduoduo for the 30-day period ending July 27, 2018.  Tianfeng found that 39 of the products, which accounted for 63.37% of sales during that period, were counterfeit.

54.     Additionally, a 21st Century Business Herald article published on July 13, 2018 quoted a Pinduoduo spokesperson as stating that Pinduoduo had returned RMB16.7 million to customers in 2017, implying that total fines were RMB1.7 million – or about 0.001% of Pinduoduo's 2017 Gross Merchandise Volume ("GMV").[5]  While Pinduoduo cited the number as proof that its anti-counterfeiting measures were effective, as investors discovered after the IPO, it is instead evidence that Pinduoduo made no effort to identify and remove counterfeit products and did not apply its 10-for-1 penalty policy.

**Skyworth Pulls Its Televisions From Pinduoduo's Platform**

55.     Skyworth, one of the world's tenth largest and one of China's three largest manufacturers of color televisions and ranked 13th among the top 100 electronic enterprises of China, derives the majority of its revenues from sales in China – 69% in the six-month period ended September 2016.

56.     On July 28, 2018, Skyworth published a statement denouncing Pinduoduo and demanding that it remove counterfeit Skyworth products from its platform.  Skyworth's statement listed counterfeit brands that were available on Pinduoduo.  The brands included Skyworth Pioneer, Skyworth Cloud TV, Skyworth Good, Skyworth Beautiful, Skyworth Kuku –

---

[5]     http://www.21jingji.com/2018/7-13/5NMDEzNzlfMTQzOTU5Ng.html

five different variations on the word "Skyworth" – along with Skyworth Cloud Audition, and Skyworth eHome.  Because Skyworth only sold its products on Pinduoduo between June 2018 and mid-July 2018, it would have been a simple matter to search for products advertised as "Skyworth" and remove them.  The products were labeled as authentic by Pinduoduo.

57.    Following Skyworth's announcement, at least four separate journalists reported that they had been able to find counterfeit Skyworth televisions on Pinduoduo with simple searches.[6]

58.    Subsequent to Skyworth's denouncement of Pinduoduo, many intellectual property holders took their disputes with Pinduoduo to the public.  For example:

    a.    On July 31, Chinese mobile phone maker Vivo complained that Vivx and Vivi sold counterfeit products that looked almost identical to its own.  Notably, Vivi's manufacturer had sold 300,000 units of the model;

    b.    On July 30, 2018, popular author of children's books Yuanjie Zheng, accused Pinduoduo on his Weibo blog of selling pirated versions of his books, noting that "[e]ven the anti-counterfeit label on the book cover was fake;"

    c.    On August 1, 2018, electronics manufacturer Konka Group Co., Ltd. joined Skyworth's protest and reported that it, too, had been complaining to Pinduoduo about counterfeits on Pinduoduo since before the IPO; and

    d.    It was reported on August 3, 2018, that the People's Literature Publishing House announced that it would sue Pinduoduo because by July 27, more than 100,000 pirated copies of Red Star over China, more than 50,000 pirated copies of The

---

[6]    See articles available at http://life.southmoney.com/xiaochangshi/201807/372698.html, http://news.sina.com.cn/c/2018-08-02/doc-ihhehtqf1528113.shtml, http://www.sohu.com/a/244472942_115362, and http://company.stcn.com/2018/0730/14414662.shtml.

Long March, and more than 50,000 pirated volumes from the Harry Potter series had been sold on Pinduoduo.[7]

59.     Skyworth's allegations were widely covered in the media:

a.     Jason Tan, *Pinduoduo Hit by Accusation of Counterfeiting*, July 30, 2018, available at: https://www.caixinglobal.com/2018-07-30/pinduoduo-hit-by-accusation-of-counterfeiting-101309938.html;

b.     Pei Li and Brenda Goh, *China to probe e-commerce firm Pinduoduo over reports of fake goods*, Reuters, July 31, 2018, available at https://www.reuters.com/article/us-pinduoduo/china-to-probe-e-commerce-firm-pinduoduo-over-reports-of-fake-goods-idUSKBN1KM3FQ;

c.     Li Tao, *Fighting fakes unavoidable in developing China's online retail market, says Pinduoduo CEO*, South China Morning Post, July 31, 2018, available at https://www.scmp.com/tech/china-tech/article/2157530/fighting-fakes-unavoidable-developing-chinas-online-retail-market;

d.     Echo Huang, *China's latest tech darling is selling a treasure trove of fake goods*, July 31, 2018, Quartz, available at https://qz.com/1344275/chinas-pinduoduo-has-a-big-problem-with-counterfeits-and-fakes/; and

e.     Fan Feifei, *Skyworth targets counterfeits on Pinduoduo platform, China Daily*, July 31, 2018, available at: http://www.chinadaily.com.cn/a/201807/31/WS5b5fc681a31031a351e91227.html

---

[7]     http://www.xinhuanet.com/english/2018-08/03/c_137365897.htm

60.     Indeed, on July 30, 2018, Chinese state broadcaster CCTV aired a report raising allegations that Pinduoduo facilitated the sale of counterfeit goods.  The report prominently featured Skyworth and Yuanjie Zheng's allegations.[8]

61.     On July 30, 2018, the price of Pinduoduo's ADSs fell from $24.60 to $22.59, down $2.10, or 8.5%, damaging investors.

62.     On Wednesday August 1, 2018, the SAMR ordered the Shanghai Municipal Administration of Industry and Commerce, a regional entity working under the SAMR's supervision, to investigate Pinduoduo for its sales of imitation products and counterfeit products. In the same announcement, the SAMR announced that it had summoned Pinduoduo for an "invited-to-talk" meeting.   Invited-to-talk meetings are formal meetings requested by an administrative agency to suggest a change of conduct, admonish, or guide the recipient.  In such a meeting, the regulator may cite more specific topics or issues that need to be addressed.

63.     The SAMR stated in its announcement on its official website that SAMR was "highly attentive to the sale of counterfeits and other problems on Pinduoduo as reported by the media" and had demanded that the Shanghai Municipal Administration of Industry and Commerce "invite and talk" with Pinduoduo.  It further demanded Administrative Agencies of Industry and Commerce and market regulatory agencies in Shanghai and other locales "seriously investigate and examine" the problems of counterfeit goods being sold on Pinduoduo, and stated that all violators "should be held seriously accountable."[9]

64.     On August 1, 2018, the price of Pinduoduo's ADSs fell from its previous close of $22.59 to close at $20.31, down $2.28, or 10.1%, damaging investors.

---

[8]     http://m.news.cctv.com/2018/07/30/ARTIvEDyeLxRZcKBhOYxoUOR180730.shtml

[9]     http://samr.saic.gov.cn/xw/yw/zj/201808/t20180801_275372.html

65.     On August 3, 2018, the SAMR published a statement on its website, providing in relevant part, that Pinduoduo should "properly treat the media's supervision and consumers' complaints; it should not shy away from its duties and tolerate and support parties infringing legitimate rights"; it also should "strengthen platform management, regulate business activities of third-party vendors, stock to law and maintain a healthy, fast and sustainable development."[10] The statement quoted Defendant Huang as stating that Pinduoduo would "cooperate with the market regulatory agencies' investigation and examination" and "thoroughly rectify and reform" its tolerance of counterfeit goods.

66.     On August 3, 2018, the price of Pinduoduo's ADSs fell from its previous close of $19.66 to close at $19.07, down $0.59, or 3.2%, damaging investors.

**Defendants' False and Misleading Statements**

67.     The Registration Statement provided, in relevant part:

*Although we have adopted strict measures to protect us against [liabilities arising from the sale of counterfeits], including proactively verifying the authenticity and authorization of products sold on our platform through working with brands and conducting offline investigations, immediately taking down any counterfeit or illegal products or misleading information found on our platform, and freezing the accounts of merchants in violation of the platform policies,* these measures may not always be successful.

(Emphasis added)

68.     The statement that Pinduoduo proactively verified the authenticity and authorization of products sold on its platform was false and misleading because, as set out above, Pinduoduo did not do so.  The remaining statements are misleading because: (1) Pinduoduo did little to address counterfeit products; (2) Pinduoduo ignored brands' complaints, like Skyworth's

---

[10]     http://samr.saic.gov.cn/xw/yw/xwfb/201808/t20180803_275397.html

complaints; (3) Pinduoduo's offline investigations (*i.e.*, spot checks) were desultory; and (4) as set forth above, the majority of the products sold in certain categories on Pinduoduo's platform were counterfeit goods.

**Pinduoduo's Net Loss Widens**

69.     From its inception in 2015 through the end of 2016, Pinduoduo derived a substantial majority of its revenues from online direct sales.

70.     Beginning in 2017, Pinduoduo transitioned into a new business model, through which it aimed to earn its revenues by online marketplace services, similarly to larger marketplaces like Alibaba and JD.com.

71.     In 2018, Pinduoduo again transitioned to a new business model.  In 2017, Pinduoduo had earned more than 90% of its revenues from commission fees, and none at all from online marketing services.  In Q1 2018, Pinduoduo generated only 20% of its revenues from commissions – and 80% from online marketing services.  At the time of the Registration Statement, Pinduoduo generated revenues "primarily from online marketplace services that [it] provide[s] to merchants."

72.     According to the Registration Statement, Pinduoduo's online marketing services consisted of "allow[ing] merchants to bid for keywords that match product listings appearing in search results on [its] platform and advertising placements such as banners, links and logos."

73.     Accordingly, at the time of the Registration Statements, Pinduoduo's model was largely untested.

74.     Pinduoduo's new business model requires that it be able to acquire users at low cost.

75.     Pinduoduo targets older and less affluent customers who previously did not participate in the online-sale economy.  The majority of Pinduoduo's customer base is located in lower-tier cities in China that are less prosperous and smaller than the higher-tired cities where traditional online marketplaces found their customers.

76.     Pinduoduo's relatively less-prosperous customers typically place much smaller orders than its competitors' users.  According to the Registration Statement, Pinduoduo's average order was $6, against $30 for Alibaba subsidiary Taobao and $60 for competitor JD.com:

| Numbers in RMB | Alibaba | JD.com | Pinduoduo |
|---|---|---|---|
| Annual spending per active user (2017) | 8,910 | 4,696 | 763 |
| Average order (2017) | 112 | 371 | 33 |

77.     Beyond that, Pinduoduo has limited monetization options.  Pinduoduo charges merchants on its platform rates of 0.6%, which are collected on behalf of third-party payment platforms and are not commissions to Pinduoduo.  In contrast, Alibaba charges its merchants a rate of 3.6%.  And unlike Alibaba, Pinduoduo's merchants are typically manufacturers with at best little-known brands who do not sell at a significant premium and have limited marketing budgets.  Accordingly, Pinduoduo has much less room to raise commission rates than Alibaba.

78.     Pinduoduo boasted that it overcame this problem through extremely low customer acquisition costs.  For example, the Registration Statement provided:

> We pioneered an innovative "team purchase" model on our platform. Buyers can access our platform and make team purchases by either visiting our platform directly or through popular social networks, such as Weixin and QQ. They are encouraged to share product information on such social networks, and invite their friends, family and social contacts to form a shopping team to enjoy the more attractive prices available under the "team purchase" option.

As a result, buyers on our platform actively introduce us to and share products offered on our platform and their shopping experiences with their friends, family and social contacts. New buyers in turn refer our platfrom [sic] to their broader family and social networks, ***generating low-cost organic traffic and active interactions and leading to exponential growth of our buyer base.*** In the twelve-month periods ended December 31, 2017 and June 30, 2018, the number of active buyers on our platform reached 245 million and 344 million, respectively.

(Emphasis added).

79.     By providing customers discounts if they can recruit their friends and family into joining into a deal, Pinduoduo turns its customers into unpaid marketers, thus reducing its own sales and marketing expense.

80.     Indeed, while Pinduoduo's per-customer acquisition costs had increased slightly from RMB3 in 2Q 2017 to RMB24 in Q1 2018, it still stood far below Alibaba's Q1 2018 costs of RMB207 and JD.com's cost of RMB339.

81.     In the Registration Statement, Pinduoduo reported its 2018 marketing expenses and boasted that these expenses as a percentage of revenues had declined sharply between 2017 and 2018:

Our sales and marketing expenses increased from RMB73.9 million in the three months ended March 31, 2017 to RMB1,217.5 million (US$194.1 million) in the three months ended March 31, 2018, ***while sales and marketing expenses as a percentage of our revenues decreased from 199.5% in the three months ended March 31, 2017 to 87.9% in the three months ended March 31, 2018.***

(Emphasis added).

82.     Accordingly, while Pinduoduo's customers were less profitable than the competition's customers, they were much cheaper to acquire, giving investors hope that Pinduoduo might nonetheless be profitable.

83. Pinduoduo's Q2 2018 financial results sharply differed from the existing trends, as Pinduoduo engaged in a massive but fruitless marketing campaign:

| RMB figures in thousands | Q2 2017 | FY 2017 | Q1 2018 | Q2 2018 |
|---|---|---|---|---|
| Sales & marketing expenses | RMB73,870 | RMB1,344,582 | RMB1,217,458 | RMB2,970,734 |
| Sales & marketing expenses in Q2 2018 as percentage of sales & marketing expenses in period | 40,200% | 220% | 244% | N/A |
| Users added in period | 17.8 million | 126.0 million (at least) | 25.2 million | 28.8 million |
| Per-user acquisition costs | RMB3 | RMB11 (at most) | RMB24 | RMB64 |
| Net loss | RMB207,723 | RMB525,115 | RMB201,021 | RMB6,694,909 |
| Net loss in Q2 2018 as percentage of net loss in period | 32,200% | 12,700% | 33,300% | N/A |

84. Thus, from Q1 2018 to Q2 2018, Pinduoduo's sales and marketing expenses more than doubled, while generating about the same number of additional users.

85. Analysts expressed dismay over the results. A Credit Suisse September 7, 2018 report listed as a key risk that Pinduoduo's sales and marketing would continue to produce weak results.

86. The increased customer acquisition costs were a known trend that must be disclosed under Item 303 of Regulation S-K.

87. SEC Regulation S-K (27 CFR 229.10) provides that registration statements such as the one filed by Pinduoduo on Form F-1 comply with the other requirements of Regulation S-

K "to the extent provided in the forms to be used for registration under the [Securities] Act." 17

C.F.R. 229.10.   Form F-1 requires registrants to furnish the information required by Part I of

Form 20-F.

88.     Part I, Item 5(d) Form 20-F, in turn, requires registrants to:

> [D]iscuss, for at least the current financial year, any known trends, uncertainties, demands, commitments or events that are reasonably likely to have a material effect on the company's net sales or revenues, income from continuing operations, profitability, liquidity or capital resources, or that would cause reported financial information not necessarily to be indicative of future operating results or financial condition.

89.     Item 5(d) of Form 20-F "call[s] for the same disclosure as Item 303 of Regulation

S-K".   *In Re Comm'n Guidance Regarding MD&A of Fin. Condition & Results of Operation*,

Release No. 8350 (Dec. 19, 2003) (the "2003 Guidance") available at 2003 WL 22996757, *1

n.1.

90.     Regulation S-K provides that the discussion of known trends, uncertainties, and

events should appear in the section of an issuer's registration statement reporting "Management's

Discussion and Analysis of Financial Condition and Results of Operations" ("MD&A").   In an

1989 Interpretive Release, the SEC described the purposes of MD&A:

> The Commission has long recognized the need for a narrative explanation of the financial statements, because a numerical presentation and brief accompanying footnotes alone may be insufficient for an investor to judge the quality of earnings and the likelihood that past performance is indicative of future performance. MD&A is intended to give investors an opportunity to look at the registrant through the eyes of management by providing a historical and prospective analysis of the registrant's financial condition and results of operations, with a particular emphasis on the registrant's prospects for the future.

*Management's Discussion & Analysis of Fin. Condition & Results of Operations*; *Certain Inv. Co. Disclosures*, Release No. 6835 (May 18, 1989) (the "1989 Interpretive Release") available at 1989 WL 1092885.[11]

91.     Item 5(d) requires disclosure based on "currently known trends, events, and uncertainties that are reasonably expected to have material effects." *Id.* at *4.

92.     Under Item 303, Pinduoduo was required to disclose that its marketing expenses had soared in Q2 2018.

93.     During trading hours on August 30, 2018, news leaked that Pinduoduo's sales and marketing expenses had soared in Q2 2018.  On August 30, 2018, the price of Pinduoduo's ADSs fell from its previous close of $21.15 to close at $17.99, down $3.16, or 14.9%, damaging investors.

## PLAINTIFFS' CLASS ACTION ALLEGATIONS

94.      Plaintiffs bring this action as a class action pursuant to Federal Rule of Civil Procedure 23(a) and (b)(3) on behalf of a Class, consisting of all those who purchased or otherwise acquired publicly traded Pinduoduo securities in its IPO and/or during the Class Period (the "Class"), and were damaged thereby. Excluded from the Class are Defendants herein, the officers and directors of the Company, at all relevant times, members of their immediate families and their legal representatives, heirs, successors or assigns and any entity in which defendants have or had a controlling interest.

95.     The members of the Class are so numerous that joinder of all members is impracticable.  There were more than 93 million ADSs sold in the IPO and throughout the Class

---

[11]     The 1989 Interpretive Guidance applies to Item 5(d) of Form 20-F. Form 20-F, Instruction 5 (stating that issuers should refer to the 1989 Interpretive Guidance); 2003 Guidance, at 2003 WL 22996757, *1 n.1 (same).

Period, Pinduoduo securities were actively traded on the NASDAQ.  While the exact number of Class members is unknown to Plaintiffs at this time and can be ascertained only through appropriate discovery, Plaintiffs believe that there are thousands of members in the proposed Class.  Record owners and other members of the Class may be identified from records maintained by Pinduoduo or its transfer agent and may be notified of the pendency of this action by mail, using the form of notice similar to that customarily used in securities class actions.

96.     Plaintiffs' claims are typical of the claims of the members of the Class as all members of the Class are similarly affected by Defendants' wrongful conduct in violation of federal law that is complained of herein.

97.     Plaintiffs will fairly and adequately protect the interests of the members of the Class and have retained counsel competent and experienced in class and securities litigation. Plaintiffs have no interests antagonistic to or in conflict with those of the Class.

98.     Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class.  Among the questions of law and fact common to the Class are: (a) whether the federal securities laws were violated by Defendants' acts as alleged herein; (b) whether statements made by Defendants to the investing public during the Class Period misrepresented material facts about the business, operations and management of Pinduoduo; (c) whether the Individual Defendants caused Pinduoduo to issue false and misleading statements during the Class Period; (d) whether the prices of Pinduoduo securities during the Class Period were artificially inflated because of Defendants' conduct complained of herein; (e) whether the members of the Class have sustained damages and, if so, what is the proper measure of damages; and (f) whether the Registration

Statement was negligently prepared and contained materially misleading statements and/or omitted material information required to be stated therein.

99.     A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable.  Furthermore, as the damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation make it impossible for members of the Class to individually redress the wrongs done to them.  There will be no difficulty in the management of this action as a class action.

## COUNT I
## Violations of Section 11 of the Securities Act
## Against All Defendants

100.     Plaintiffs repeat and reallege each and every allegation contained in the foregoing paragraphs as if fully set forth herein.  This claim is not based on, and does not sound in, fraud.

101.     This claim is brought by Plaintiffs and on behalf of other members of the Class who purchased or otherwise acquired Pinduoduo securities pursuant and/or traceable to the Company's IPO.  Each member of the Class acquired his, her, or its shares pursuant and/or traceable to, and in reliance on, the Offering Documents.  Pinduoduo is the issuer of the securities through the Offering Documents, on which the Individual Defendants were signatories.

102.     Defendants issued and disseminated, and caused to be issued and disseminated, and participated in the issuance and dissemination of, material misstatements and/or omissions to the investing public that were contained in the Offering Documents, which misrepresented or failed to disclose, among other things, the facts as set forth above.  By reason of the conduct

alleged herein, each Defendants violated and/or controlled a person who violated Section 11 of the Securities Act, 15 U.S.C. §77k.

103.    Pinduoduo is the issuer of the securities sold via the Offering Documents.  As issuer of these securities, the Company is strictly liable to Plaintiffs and the Class members for the material misstatements and omissions contained therein.

104.    At the times they obtained their shares of the Company, Plaintiffs and the members of the Class did so without knowledge of the facts concerning the misstatements and omissions alleged herein.

105.    This claim is brought within one year after discovery of the untrue statements and/or omissions in the Offering Documents that should have been made and/or corrected through the exercise of reasonable diligence, and within three years of the effective date of the Offering Documents.  It is therefore timely.

106.    At the time of the purchases and/or acquisitions by Plaintiffs and the Class, the true value of Pinduoduo securities was substantially lower than the prices paid by Plaintiffs and the other members of the Class.

107.    By reason of the foregoing, Plaintiffs and the other members of the Class are entitled to damages as measured by the provisions of Section 11(e), 15 U.S.C. 77K(e), from the Defendants and each of them, jointly and severally.

**COUNT II**
**Violations of Section 15 of the Securities Act Against**
**Individual Defendants**

108.     Plaintiffs repeat and reallege each and every allegation contained in the foregoing paragraphs as if fully set forth herein.

109.   This claim is asserted against the Individual Defendants, each of whom was a control person of the Company at relevant times.

110.   The Individual Defendants were control persons of the Company by virtue of, inter alia, their positions as senior officers and/or directors of the Company, the fact that they signed the Offering Documents, and/or they were in positions to control and did control, the false and misleading statements and omissions contained in the Offering Documents.

111.   The Individual Defendants did not make reasonable investigation or possess reasonable grounds for the belief that the statements contained in the Offering Documents were accurate complete in all material respects.  Had they exercised reasonable care, they could have known of the material misstatements and omissions alleged herein.

112.   This claim was brought within one year after the discovery of the untrue statements and omissions in the Offering Documents and within three years after Pinduoduo securities were sold to the Class in connection with the IPO.  It is therefore timely.

113.   By reason of the above conduct, for which the Company's is primarily liable, as set forth above, Individual Defendants are jointly and severally liable with and to the same extent as Pinduoduo pursuant to Section 15 of the Securities Action, 15 U.S.C. 77o.

## EXCHANGE ACT CLAIMS

**Additional False Statements**

114.   Defendants claimed in the Registration Statement that Pinduoduo complied with Chinese laws prohibiting platforms from knowingly selling counterfeits:

> The Tort Liability Law of the PRC [] provides that if an online service provider is aware that an online user is committing infringing activities, such as selling counterfeit products, through its internet services and fails to take necessary measures, it shall be jointly liable with the said online user for such infringement. If the online service provider receives any notice from the infringed party on any infringing activities, the online service provider shall take necessary measures,

including deleting, blocking and unlinking the infringing content, in a timely manner. Otherwise, it will be jointly liable with the relevant online user for the extended damages.

*We are subject to the PRC Consumer Rights and Interests Protection Law, the Online Trading Measures and the Tort Liability Law of the PRC as an e-commerce platform service provider and believe that we are currently in compliance with these regulations in all material aspects.*

(Emphasis added).

115.    This statement was false because, as more fully set out below, Pinduoduo ignored brands' complaints that it hosted infringing products.

**Pinduoduo's Surprise IPO Shows that Defendants Intended to Conceal the Increase in Sales and Marketing Expenses in Q2 2018**

116.    Unlike giants such as Alibaba and JD.com, Pinduoduo is a relatively small company, with only 1,159 employees as of December 31, 2017.

117.    Pinduoduo's Q2 2018 ended on June 30, 2018.  Accordingly, it had been entirely completed by the time of the IPO on July 26, 2018.  Moreover, Pinduoduo had complete information about its Q2 2018 by July 11, 2018, at the latest.

118.    FE3 was an operation data analyst working for Hangzhou Weimi, a wholly-owned PRC subsidiary of Pinduoduo, between August 2015 and July 2016.  FE3's responsibilities included creating data analysis reports, including daily, monthly, quarterly, semi and annual reports.    According to FE3, monthly analyses took one week to prepare, while quarterly statements took 10 days.

119.    FE4 was an accountant who worked for Hangzhou Weimi between October 2015 and October 2018.  FE4 worked on company-wide financial reports.  According to FE4, monthly financial reports were completed by the seventh day of the following month.  Thus, by the time

of the IPO, which took place on July 28, Defendants would have available to them both monthly and quarterly financial and data analysis reports.

120.   Pinduoduo first filed a confidential draft registration statement on May 7, 2018. At that time, Pinduoduo was halfway through its Q2 2018.  The confidential draft registration statement was not disclosed to the public.

121.   The IPO, which was disclosed in June 2018, came as a complete surprise to capital markets.

122.    The IPO also came as a surprise to shareholders – so much so that Defendants were compelled to send a letter to shareholders and reprint it as pages 1-3 of the Registration Statement to address the question of "why are we bringing *Pinduoduo* into the ebbs and flows of the capital markets so soon?"

123.   The IPO even came as a complete surprise to Pinduoduo employees.  FE5 was an Operations Manager at Shanghai Xunmeng Information Tech. Co. Ltd., a subsidiary of Pinduoduo's variable interest entity, between April 2016 and July 2018.  FE5 said that had FE5 known about the IPO, FE5 would definitely have stayed with Pinduoduo.  Yet, when FE5 submitted a letter of resignation in late June 2018, even FE5's supervisor had no idea Pinduoduo would file for an IPO shortly thereafter.

124.   Indeed, just five months before its IPO, Pinduoduo had sold certain of its shares to Chinese media company Tencent Mobility Limited for more than $1.36 billion – calling into question why it even needed any more capital.

125.   Defendants avoided mentioning or reporting the Q2 financial results in the Registration Statement, though the financial statements had already been completed.  Nor did

Pinduoduo even warn in the Registration Statement that its sales and marketing expenses and net loss had soared in Q2 2018.

126.    Defendants hoped to complete the Pinduoduo IPO before they had to report Q2 2018 results.  They were successful in doing so, and they thereby avoided the market's scrutiny of their results.

### Defendants Knew Pinduoduo Made Little Effort to Fight Counterfeit Products

127.    Defendants knew that Pinduoduo served as a market for counterfeit goods. Defendants were actually aware of many instances of counterfeiting – ***including the very Skyworth counterfeits whose disclosure brought on the SAMR investigation***.

128.    Skyworth had opened a flagship store on Pinduoduo on June 17, 2018.  On June 20, 2018, Skyworth's eCommerce Director visited Pinduoduo and the two companies set up a working group to integrate their systems.

129.    According to Da Da, a co-founder of Pinduoduo, the Skyworth partnership was intended to be a long-term relationship.  Skyworth's products are technologically advanced and have an excellent reputation.  Because Skyworth is a large, high-quality brand, the partnership was also a milestone for Pinduoduo.

130.    Beginning on June 20, 2018, Skyworth repeatedly requested that Pinduoduo remove merchants selling counterfeit Skyworth products from the Pinduoduo platform. Pinduoduo, however, did nothing.

131.    Frustrated by Pinduoduo's torpor, on July 20, 2018, Skyworth removed all products from Pinduoduo and terminated the partnership.

132.    Understanding that the true facts were damning, on July 31, 2018, at a press conference, Defendant Huang falsely told reporters that Skyworth had closed its store "without reason."

133.    Skyworth's CEO rebutted Huang's false claims that same day at Skyworth's 2018 New Product Strategic Release Meeting.  Skyworth CEO  told reporters that Skyworth had found a large number of Skyworth counterfeit products on Pinduoduo, had repeatedly demanded that Pinduoduo take them down, but that Pinduoduo had taken no action at all as of mid-July, prompting Skyworth to terminate the partnership.[12]

134.    Thus, Defendants knew of Skyworth's claims that Pinduoduo sold counterfeit goods even before the IPO, knew they were true, and nonetheless touted purported anti-counterfeit measures in the Registration Statement.

135.    Moreover, media reports informed Defendants of specific flaws in Pinduoduo's platform which it did not remedy.  For example, as alleged above, on August 1, 2018, a journalist reported that he was able to set up an account to sell baby milk powder with a fake identification.

136.    Yet, four months earlier, a journalist had published an article setting out *the very same security flaw*.  On April 4, 2018, the Beijing News reported that one of its journalists had a friend set up a vendor on Pinduoduo and upload photos of an Adidas-branded sweater, writing in the description that it was a "real Nike sweater," and offered them for sale at RMB60 each, or about $10, far below the price of either a Nike or Adidas sweater.  The reporter did not provide any authorizations from either Nike or Adidas.  Pinduoduo nonetheless approved the reporter's application in *10 seconds*.  Thereafter, the reporter was allowed to sell products immediately.

---

[12]    http://www.bjnews.com.cn/invest/2018/08/02/497707.html

137.    The April 4 article thus alerted Pinduoduo that its platform allowed merchants to sell products without the brand's authorization.  Defendants stated in the Registration Statement that Pinduoduo would not allow sales without prior brand authorization.  Thus, investors who had seen the April 4 article assumed Pinduoduo had fixed the problem.  Yet, the August 1, 2018 article showed that Pinduoduo had not resolved the problem.

138.    After Skyworth's announcement, Pinduoduo initially attempted to dodge responsibility.  On July 31, 2018, Pinduoduo co-founder Da Da held a news conference in which he blamed Pinduoduo's counterfeit problems on "human nature" and "soci[ety]."  Da Da also admitted that Pinduoduo was ineffective at controlling counterfeit products but claimed it was blameless because it was only three-years old.  This assertion was a significant departure from Pinduoduo's claims in the Registration Statement filed a week earlier, wherein it had touted the strict measures it purportedly undertook to prevent the sale of counterfeit goods.

139.    When Pinduoduo's strategy of blaming society failed, Defendants quickly admitted that they had been aware of the problem and had done little to solve it.  On August 3, Pinduoduo admitted that it was "fully aware that problems that existed in the past should not continue to exist in the future."   Defendant Huang added that Pinduoduo endeavored to "'thoroughly rectify and reform' its conduct, cooperate with regulators and not shirk its responsibilities."[13]

140.    Nor were the problems of counterfeit products difficult to address.  Pinduoduo told investors on August 30 that in the week ending August 9, 2018, it had removed 4.3 million infringing listings from its platform, and that in all of 2017 it had removed only 10.7 million.

---

[13]      http://www.chinadaily.com.cn/a/201808/22/WS5b7ca201a310add14f387069_3.html

Thus, in just a week, Pinduoduo removed more than 40% of the listings it had removed in all of 2017.  Thus, there were a host of counterfeit goods for sale on Pinduoduo.

141.    Accordingly, Defendants knew that Pinduoduo did little to prevent the sale of counterfeit products because the Company derived substantial revenues from such sales.

### *Respondeat Superior* **and Liability Under Section 20(a) of the Exchange Act**

142.    Pinduoduo is liable for the acts of the Individual Defendants and its employees under the doctrine of *respondeat superior* and common law principles of agency as all of the wrongful acts complained of herein were carried out within the scope of their employment with authorization.

143.    The scienter of the Individual Defendants and other employees and agents of the Company is similarly imputed to Pinduoduo under *respondeat superior* and agency principles.

144.    Pinduoduo had access to the adverse undisclosed information about the Company's business, operations, operational trends, financial statements, markets and present and future business prospects via access to internal corporate documents and via reports and other information provided in connection therewith.

145.    Throughout the Class Period, Pinduoduo was able to control the content of the various SEC filings, press releases and other public statements pertaining to the Company during the Class Period.   Defendants had access to the documentation of filings alleged herein to be misleading prior to or shortly after their issuance and/or had the ability and/or opportunity to prevent their issuance or to cause them to be corrected.  Accordingly, Defendants are responsible for the accuracy of the public reports and press releases detailed herein, and are therefore primarily liable for the representations contained therein.

## APPLICATION OF PRESUMPTION OF RELIANCE:
## <u>FRAUD ON THE MARKET</u>

146.    Plaintiffs will rely, in part, upon the presumption of reliance established by the fraud-on-the-market doctrine in that, among other things: (a) Defendants made public statements that were rendered misleading because they failed to disclose material facts necessary to prevent such statement from being misleading during the Class Period; (b) the omissions were material; (c) Pinduoduo securities were traded in efficient markets during the Class Period.

147.    Pinduoduo's securities traded in efficient markets during the Class Period for the following reasons: (i) the securities were traded on NASDAQ; (ii) on average shares representing more than 2.0% of the securities' float were traded weekly during the Class Period; (iii) Pinduoduo met the criteria for eligibility to file an S-3 Registration Statement during the Class Period; (iv) Pinduoduo timely filed all required annual, quarterly and material event reports with the SEC during the Class Period; (v) Pinduoduo regularly communicated with public investors via established market communication mechanisms, including through regular dissemination of press releases on the national circuits of major newswire services and through other wide-ranging public disclosures, such as communications with the financial press and other similar reporting services; (vi) the price of Pinduoduo securities responded quickly to incorporate and reflect new public information concerning Pinduoduo during the Class Period.

148.    In addition, Chinese company Tencent Holdings Ltd. ("Tencent") and its affiliates held 17.8% of Pinduoduo's equity securities, which amounted to a significant proportion of Tencent's total assets. During the Class Period, analysts wrote numerous articles on Tencent, including some which referenced Pinduoduo.

**COUNT III**
**Violation of Section 10(b) of**
**The Exchange Act and Rule 10b-5 Promulgated Thereunder**
**Against All Defendants**

149.    Plaintiffs repeat and reallege each and every allegation contained above as if fully set forth herein.

150.    During the Class Period, Defendants named in this Claim carried out a plan, scheme and course of conduct which was intended to and, throughout the Class Period, did: (1) deceive the investing public, including Plaintiffs and other Class members, as alleged herein; and (2) cause Plaintiffs and other members of the Class to purchase Pinduoduo's securities at artificially-inflated prices.  In furtherance of this unlawful scheme, plan and course of conduct, Defendants, and each of them, took the actions set forth herein.

151.    Defendants: (a) employed devices, schemes, and artifices to defraud; (b) made untrue statements of material fact and/or omitted to state material facts necessary to make the statements not misleading; and (c) engaged in acts, practices, and a course of business that operated as a fraud and deceit upon the purchasers of the Company's securities in an effort to maintain artificially-high market prices for Pinduoduo's securities in violation of Section 10(b) of the Exchange Act and Rule 10b-5 thereunder.

152.    Defendants, directly and indirectly, by the use, means or instrumentalities of interstate commerce and/or of the mails, engaged and participated in a continuous course of conduct to conceal adverse material information about the business, operations and future prospects of Pinduoduo as specified herein.

153.    These Defendants employed devices, schemes, and artifices to defraud while in possession of material adverse non-public information, and engaged in acts, practices, and a

course of conduct as alleged herein in an effort to assure investors of Pinduoduo's value and performance and continued substantial growth, which included the making of, or participation in the making of, untrue statements of material facts and omitting to state material facts necessary in order to make the statements made about Pinduoduo and its business operations and future prospects in the light of the circumstances under which they were made, not misleading as set forth more particularly herein, and engaged in transactions, practices and a course of business that operated as a fraud and deceit upon the purchasers of Pinduoduo's securities during the Class Period.

154.    Defendants had actual knowledge of the misrepresentations and omissions of material facts set forth herein, or acted with reckless disregard for the truth in that they failed to ascertain and to disclose such facts, even though such facts were available.   Such material misrepresentations and/or omissions were done knowingly or recklessly and for the purpose and effect of concealing Pinduoduo's operating condition and future business prospects from the investing public and supporting the artificially-inflated price of its securities.   As demonstrated by overstatements and misstatements of the Company's financial condition throughout the Class Period, if the Defendants did not have actual knowledge of the misrepresentations and omissions alleged, they were reckless in failing to obtain such knowledge by deliberately refraining from taking those steps necessary to discover whether those statements were false or misleading.

155.    As a result of the dissemination of the materially false and misleading information and failure to disclose material facts, as set forth above, the market price of Pinduoduo's securities was artificially inflated during the Class Period.   In ignorance of the fact that market prices of Pinduoduo's publicly-traded securities were artificially inflated, and relying directly or indirectly on the false and misleading statements made by the Defendants, or upon the integrity

of the market in which the securities trades, and/or on the absence of material adverse information that was known to or recklessly disregarded by the Defendants, but not disclosed in public statements by the Defendants during the Class Period, Plaintiffs and the other members of the Class acquired Pinduoduo securities during the Class Period at artificially high prices, and were, or will be, damaged thereby.

156.   At the time of said misrepresentations and omissions, Plaintiffs and other members of the Class were ignorant of their falsity, and believed them to be true.  Had Plaintiffs and the other members of the Class and the marketplace known the truth regarding Pinduoduo's financial results, which was not disclosed by the Defendants, Plaintiffs and other members of the Class would not have purchased or otherwise acquired their Pinduoduo securities, or, if they had acquired such securities during the Class Period, they would not have done so at the artificially inflated prices that they paid.

157.   As a direct and proximate result of the Defendants' wrongful conduct, Plaintiffs and other members of the Class suffered damages in connection with their purchases of Pinduoduo securities during the Class Period.

158.   This action was filed within two years of discovery of the fraud and within five years of Plaintiffs' purchases of securities giving rise to the cause of action.

### COUNT IV
### Violation of Section 20(a) of The Exchange Act
### Against the Individual Defendants

159.    Plaintiffs repeat and reallege each and every allegation contained above as if fully set forth herein.

160.   The Individual Defendants acted as controlling persons of Pinduoduo within the meaning of Section 20(a) of the Exchange Act as alleged herein.  By virtue of their high-level

positions, agency, and their ownership and contractual rights, participation in and/or awareness of the Company's operations and/or intimate knowledge of aspects of the Company's revenues and earnings and dissemination of information to the investing public, the Individual Defendants had the power to influence and control, and did influence and control, directly or indirectly, the decision-making of the Company, including the content and dissemination of the various statements that Plaintiffs contends are false and misleading.  The Individual Defendants were provided with or had unlimited access to copies of the Company's reports, press releases, public filings and other statements alleged by Plaintiffs to be misleading prior to and/or shortly after these statements were issued, and had the ability to prevent the issuance of the statements or to cause the statements to be corrected.

161.    In particular, each of these Defendants had direct and supervisory involvement in the day-to-day operations of the Company and, therefore, is presumed to have had the power to control or influence the particular transactions giving rise to the securities violations as alleged herein, and exercised the same.

162.    As set forth above, Pinduoduo and the Individual Defendants each violated Section 10(b) and Rule 10b-5 by their acts and omissions as alleged in this Complaint.

163.    By virtue of their positions as controlling persons, the Individual Defendants are liable pursuant to Section 20(a) of the Exchange Act as they culpably participated in the fraud alleged herein.  As a direct and proximate result of Defendants' wrongful conduct, Plaintiffs and other members of the Class suffered damages in connection with their purchases of the Company's securities during the Class Period.

164.    This action was filed within two years of discovery of the fraud and within five years of Plaintiffs' purchases of securities giving rise to the cause of action.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs, on behalf of herself and the Class, prays for judgment and relief as follows:

a.      declaring this action to be a proper class action, and certifying Plaintiff as class representatives under Rule 23 of the Federal Rules of Civil Procedure and designating Plaintiffs' counsel as Class Counsel;

b.      awarding damages in favor of Plaintiffs and the other Class members against all Defendants, jointly and severally, together with interest thereon;

c.      awarding Plaintiffs and the Class reasonable costs and expenses incurred in this action; and

d.      awarding Plaintiffs and other members of the Class such other and further relief as the Court may deem just and proper.

## JURY TRIAL DEMANDED

Plaintiffs hereby demand a trial by jury.

Dated: February 22, 2019                              Respectfully submitted,

**GLANCY PRONGAY & MURRAY LLP**

By: _s/ Lesley F. Portnoy_
Lesley F. Portnoy
230 Park Ave., Suite 530
New York, New York 10169
Telephone: (212) 682-5340
Facsimile: (212) 884-0988
Email: lportnoy@glancylaw.com

Ex Kano S. Sams II
1925 Century Park East, Suite 2100
Los Angeles, CA 90067
Telephone: (310) 201-9150
Facsimile: (310) 201-9160
Email: esams@glancylaw.com

**ROBBINS ARROYO LLP**
Stephen J. Oddo
Gregory E. Del Gaizo
5040 Shoreham Place
San Diego, CA 92122
Telephone: (619) 525-3990
Facsimile: (619) 525-3991
E-mail:soddo@robbinsarroyo.com
gdelgaizo@robbinsarroyo.com

*Co-Lead Counsel for Lead Plaintiffs and the Class*

**THE ROSEN LAW FIRM, P.A.**
Laurence Rosen
Phillip Kim
Jonathan Horne
275 Madison Avenue, 34th Floor
New York, NY  10016
Phone: (212) 686-1060
Fax: (212) 202-3827

*Additional Counsel for Lead Plaintiffs' and the Class*

**PROOF OF SERVICE**

I, the undersigned say:

I am not a party to the above case and am over eighteen years old.

On February 22, 2019, I served true and correct copies of the foregoing document, by posting the document electronically to the ECF website of the United States District Court for the Southern District of New York, for receipt electronically by the parties listed on the Court's Service List.

I affirm under penalty of perjury under the laws of the United States of America that the foregoing is true and correct. Executed on February 22, 2019.

*s/ Lesley F. Portnoy*
Lesley F. Portnoy