UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------------x
KERRY ASAY and JOHAN JOHAN,

                        Plaintiffs,                        18-cv-7625 (PKC)

            -against-                             OPINION
                                                   AND ORDER

PINDUODUO INC., ZHENG HUANG, TIAN
XU, LEI CHEN, ZHENWEI ZHANG, JUNYUN
XIAO, HAIFENG LIN, ZHEN ZHANG,
NANPENG SHEN and JIANMING YU,

                        Defendants.
------------------------------------------------------------x

CASTEL, U.S.D.J.

        Defendant Pinduoduo, Inc. ("Pinduoduo" or the "Company") operates an online

marketplace that sells consumer products in China.  It held an Initial Public Offering on July 26,

2018, and its American Depositary Shares ("ADSs") trade on the NASDAQ.

        According to the Consolidated Amended Class Action Complaint (the

"Complaint"), Pinduoduo's offering documents included material misrepresentations and

omissions that violated sections 11 and 15 of the Securities Act of 1933 (the "Securities Act"),

15 U.S.C. §§ 77k, 77o, and sections 10(b) and 20(a) the Securities Exchange Act of 1934 (the

"Exchange Act"), §§ 78j(b), 78(a).  The purported misstatements relate to two topics: the

claimed effectiveness of the Company's anti-counterfeiting programs and the expense of its

advertising and marketing strategy.

        Defendants move to dismiss the Complaint pursuant to Rule 12(b)(6), Fed. R.

Civ. P.  For the reasons that will be explained, the Court concludes that the Complaint fails to

allege that defendants misrepresented or omitted material information, and that, as to the

Exchange Act claims, it also fails to raise a cogent and compelling inference of scienter, as required by the Private Securities Litigation Reform Act (the "PSLRA"), 15 U.S.C. § 78u-4, and Rule 9(b), Fed. R. Civ. P. Defendants' motion will therefore be granted.

BACKGROUND.

A. Overview of Pinduoduo.

Pinduoduo is an online marketplace that operates in the People's Republic of China. (Compl't ¶ 2.) It was founded in 2015 by defendant Zheng Huang, the Company's CEO and chairman. (Compl't ¶¶ 15, 27.) As of June 30, 2018, it had approximately 344 million active customers. (Compl't ¶ 27.)

Pinduoduo acts as a broker that connects buyers and sellers, and it earns revenue through merchant advertisements; it does not sell products directly to consumers. (Compl't ¶ 28.) It encourages its customers to engage on social media as they shop, and gives discounts to buyers who make group purchases. (Compl't ¶ 30.) It largely targets consumers who earn lower incomes and live in underserved areas of China and sells few established brands. (Compl't ¶¶ 31-32.)

Pinduoduo filed a registration statement and prospectus with the SEC on July 24, 2018. (Compl't ¶ 35.) It sold 85.6 million ADSs at a price of $19 in its IPO of July 26, 2018. (Compl't ¶ 36.) Its ADSs trade on the NASDAQ under the symbol PDD. (Compl't ¶ 14.)

B. Pinduoduo's Anti-Counterfeiting Measures.

According to the Complaint, the sale of counterfeit goods is widespread in China's online marketplaces. (Compl't ¶ 38.) In recent years, China has passed several laws related to the sale of counterfeit goods online, including measures requiring e-commerce platforms to monitor for violations. (Compl't ¶¶ 39-41.)

Plaintiffs allege that the Company materially misrepresented the effectiveness of its anti-counterfeiting measures in the following passage of its registration statement:

> Although we have adopted strict measures to protect against [liabilities arising from the sale of counterfeits], including proactively verifying the authenticity and authorization of products sold on our platform through working with brands and conducting offline investigations, immediately taking down any counterfeit or illegal products or misleading information found on our platform, and freezing the accounts of merchants in violation of the platform policies, these measures may not always be successful.

(Compl't ¶ 67.) The offering documents further explained that the Company could face claims from customers, brands or government entities if counterfeit products were sold through Pinduoduo. (Fumerton Dec. Ex. B. at 22-23.) They stated that the site's 1.7 million merchants were ultimately responsible for the sourcing of their products, and that the Company had historically been subject to claims related to the sale of counterfeit goods and could continue to be subject to such claims in the future. (Id.)

The Complaint alleges that the Company's enforcement efforts were halfhearted. (Compl't ¶¶ 46-51.) Pinduoduo performed only about 210 spot checks a day, representing a tiny fraction of the Company's total sales. (Compl't ¶ 47.) Merchants who were banned from competitor websites transferred their business to Pinduoduo. (Compl't ¶ 48.) The Company had a formal policy that required merchants to certify that their sales of branded goods were authorized, but asserts that once a merchant was registered, Pinduoduo took no efforts to stop it from selling counterfeits. (Compl't ¶¶ 49-50.) Tianfeng Securities, a Chinese brokerage company, has estimated that 39 of Pinduoduo's 100 most popular appliances were counterfeits, accounting for 63.37% of the Company's appliance sales. (Compl't ¶ 53.)

The Complaint alleges that, just after the IPO, Pinduoduo's problem with counterfeiting reached a breaking point with Skyworth, a major television manufacturer in the

Chinese market.  (Compl't ¶¶ 55-66.)  On July 28, 2018 – four days after the filing of the registration statement and two days after the IPO – Skyworth published a statement demanding that the Company remove all counterfeit Skyworth products from its platform.  (Compl't ¶ 56.) Other major Chinese brands followed Skyworth's lead, including book publishers and manufacturers of electronics and mobile phones.  (Compl't ¶ 58.)  News outlets in China reported on Skyworth's statement and the presence of counterfeit goods sold through Pinduoduo. (Compl't ¶ 59.)

The Complaint alleges that the defendants knew Pinduoduo had made insufficient efforts to fight counterfeiting.  (Compl't ¶¶ 127-41.)  The Company and Skyworth had planned to enter into a long-term business relationship, but Skyworth removed all products from Pinduoduo after it found the Company's anti-counterfeiting measures to be lacking.  (Compl't ¶¶ 127-31.)  On July 31, 2018, Huang falsely told reporters that Skyworth had stopped selling on Pinduoduo "without reason."  (Compl't ¶ 132.)  The Company failed to step up its anti-counterfeiting efforts despite widespread journalistic accounts of its problems, plaintiffs allege. (Compl't ¶¶ 134-40.)

The Complaint asserts that corrective disclosures about the Company's lax anti-counterfeiting measures caused drops in its stock price.  On July 30, 2018, China's state broadcasting company aired a report on Skyworth's complaints about Pinduoduo.  (Compl't ¶ 60.)  That day, the price of the Company's ADSs dropped from $24.60 to $22.59.  (Compl't ¶ 61.)

On August 1, 2018, China's State Administration for Market Regulation ("SAMR") ordered the Shanghai Municipal Administration of Industry and Commerce to investigate Pinduoduo for its sales of counterfeit products, and publicly summoned Pinduoduo to

a formal meeting.  (Compl't ¶ 62.)  The SAMR stated that it was "highly attentive" to the sale of counterfeit products.  (Compl't ¶ 63.)  That day, the price of the Company's ADSs dropped from $22.59 to $20.31.  (Compl't ¶ 64.)

On August 3, 2018, the SAMR posted a statement on its website stating that Pinduoduo should react "properly" to media reports and consumer complaints, and should not "tolerate and support" infringement.  (Compl't ¶ 65.)  The statement included a pledge of cooperation from defendant Huang.  (Compl't ¶ 65.)  That day, the price of the Company's ADSs dropped from $19.66 to $19.07.  (Compl't ¶ 66.)

C.  Pinduoduo's Marketing Expenses.

According to the Complaint, Pinduoduo's business model required it to acquire new users at a low cost.  (Compl't ¶ 74.)  Instead of earning revenue through sales commissions, like many online merchants, it derives revenue from marketing services.  (Compl't ¶ 71.)  Pinduoduo allows merchants to bid for keywords that matched their product listings in search results, and to advertise with banners, links and logos.  (Compl't ¶ 72.)  According to the Complaint, this model was "largely untested" at the time the Company filed its offering documents.  (Compl't ¶ 73.)

The Complaint alleges that the Company seeks out older, less-affluent consumers who are not active in e-commerce.  (Compl't ¶ 75.)  The majority of its customers are described as being in "lower-tier cities" that are less prosperous and smaller than the cities targeted by Pinduoduo's major rivals.  (Compl't ¶ 75.)  The average Pinduoduo order is $6, as opposed to averages of $30 and $60 for its main competitors.  (Compl't ¶ 76.)  The Company collects only modest charges from merchants when a sale is made and uses them to offset expenses to third-party payment platforms.  (Compl't ¶ 77.)

The offering documents stated that users were encouraged to share product information over social networks and to make "team purchases" at discounted prices. (Compl't ¶ 78.) The Complaint alleges that Pinduoduo's approach had the effect of making its customers unpaid marketers, thus reducing the Company's own marketing expenses, relative to its competitors. (Compl't ¶¶ 79-80.) Thus, according to the Complaint, while the Company's customers were less affluent and made smaller purchases, Pinduoduo's lower marketing costs led investors to expect that the Company would be profitable. (Compl't ¶ 82.)

The registration statement included the following factual statement about the Company's sales and marketing expenses:

> Our sales and marketing expenses increased from RMB73.9 million in the three months ended March 31, 2017 to RMB1,217.5 million (US$194.1 million) in the three months ended March 31, 2018, while sales and marketing expenses as a percentage of our revenues decreased from 199.5% in the three months ended March 31, 2017 to 87.9% in the three months ended March 31, 2018.

(Compl't ¶ 81.) In other words, the Company's marketing expenses had increased more than sixteenfold over the period of a year. According to the Complaint, this statement omitted material information about a spike in marketing expenses between the first and second quarters of 2018, during which the Company's marketing costs more than doubled, while the growth rate of new users remained roughly steady. (Compl't ¶ 84.) According to the Complaint, Pinduoduo had knowledge that its marketing costs were mounting as its customer-acquisition growth failed to keep pace, and it was required to disclose that trend in the Company's registration statement pursuant to Item 303 of Regulation S-K. (Compl't ¶¶ 86-92.)

According to the Complaint, on August 30, 2018, "news leaked" that the Company's sales and marketing expenses had increased in the second quarter of 2018. (Compl't

¶ 93.)  That day, the value of the Company's ADSs dropped from $21.15 to $17.99.  (Compl't ¶ 93.)

       D.  <u>Overview of Plaintiffs' Claims.</u>

Lead plaintiffs Kerry Asay and Johan Johan allege that they purchased Pinduoduo securities at artificially inflated prices.  (Compl't ¶ 13.)  In addition to the Company itself, the defendants include Zheng, the Company's CEO and chairman, Tian Xu, its Principal Financial and Accounting Officer, and seven members of the Company's board.  (Compl't ¶¶ 15-23.)

The Complaint alleges direct and control person liability under both the Securities Act and the Exchange Act.  Count One alleges that all defendants violated section 11 of the Securities Act, 15 U.S.C. § 77k.  (Compl't ¶¶ 100-07.)  Count Two alleges that all individual defendants are liable as control persons under section 15 of the Securities Act, 15 U.S.C. § 77o.  (Compl't ¶¶ 108-13.)  Count Three alleges that all defendants violated section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder.  (Compl't ¶¶ 149-58.)  Count Four alleges that all individual defendants are liable as control persons under section 20(a) of the Exchange Act.  (Compl't ¶¶ 159-64.)

MOTION TO DISMISS STANDARD.

       A.  <u>Rule 12(b)(6) Standard.</u>

To survive a motion to dismiss under Rule 12(b)(6), "a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'"  <u>Ashcroft v. Iqbal</u>, 556 U.S. 662, 678 (2009) (quoting <u>Bell Atlantic Corp. v. Twombly</u>, 550 U.S. 544, 570 (2007)).  Legal conclusions are not entitled to the presumption of truth, and a court assessing the sufficiency of a complaint disregards them.  <u>Iqbal</u>, 556 U.S. at 678.  Instead, the Court must examine only the well-pleaded factual allegations, if any, "and then determine

whether they plausibly give rise to an entitlement to relief." Id. at 679. The Complaint must include non-conclusory factual allegations that "'nudge[ ]'" its claims "'across the line from conceivable to plausible.'" Id. at 680 (quoting Twombly, 550 U.S. at 570).

In addition to considering the Complaint's allegations, a court "may consider any written instrument attached to the complaint, statements or documents incorporated into the complaint by reference, legally required public disclosure documents filed with the SEC, and documents possessed by or known to the plaintiff and upon which it relied in bringing the suit." ATSI Commc'ns, Inc. v. Shaar Fund, Ltd., 493 F.3d 87, 98 (2d Cir. 2007). Exhibit B to the Fumerton Declaration includes excerpts of Pinduoduo's offering documents, which are referenced throughout the Complaint and are properly considered on a Rule 12(b)(6) motion without converting the motion into one for summary judgment.

B. The Heightened Pleading Standard of Rule 9(b) and the PSLRA.

A plaintiff bringing claims under section 10(b) and Rule 10b-5 must "satisfy the heightened pleading requirements of the [PSLRA] and Rule 9(b) of the Federal Rules of Civil Procedure." Indiana Pub. Ret. Sys. v. SAIC, Inc., 818 F.3d 85, 92 (2d Cir. 2016).

"[T]he PSLRA specifically requires a complaint to demonstrate that the defendant made '[m]isleading statements and omissions . . . of a material fact,' 15 U.S.C. § 78u-4(b)(1), and acted with the '[r]equired state of mind' (the 'scienter requirement'), id. § 78u-4(b)(2)." Emp. Ret. Sys. of Gov't of the Virgin Islands v. Blanford, 794 F.3d 297, 305 (2d Cir. 2015). "The plaintiff may satisfy this requirement by alleging facts (1) showing that the defendants had both motive and opportunity to commit the fraud or (2) constituting strong circumstantial evidence of conscious misbehavior or recklessness." ATSI, 493 F.3d at 99. "'[I]n determining whether the pleaded facts give rise to a 'strong' inference of scienter, the court must take into

account plausible opposing inferences.'" Id. (quoting Tellabs, Inc. v. Makor Issues & Rights, Ltd., 551 U.S. 308, 336 (2007)). A complaint "therefore must allege with particularity facts that give rise to 'a strong inference' that [defendants] acted consciously and recklessly in omitting or misrepresenting financial information." Indiana Pub. Ret. Sys., 818 F.3d at 93.

Similarly, Rule 9(b) states: "In alleging fraud or mistake, a party must state with particularity the circumstances constituting fraud or mistake. Malice, intent, knowledge, and other conditions of a person's mind may be alleged generally." "To satisfy the pleading standard for a misleading statement or omission under Rule 9(b), a complaint must '(1) specify the statements that the plaintiff contends were fraudulent, (2) identify the speaker, (3) state where and when the statements were made, and (4) explain why the statements were fraudulent.'" Emp. Ret. Sys. of Gov't of the Virgin Islands, 794 F.3d at 305 (quoting Rombach v. Chang, 355 F.3d 164, 170 (2d Cir. 2004). "This pleading constraint serves to provide a defendant with fair notice of a plaintiff's claim, safeguard his reputation from improvident charges of wrongdoing, and protect him against strike suits." ATSI, 493 F.3d at 99.

DISCUSSION.

        I.        The Complaint Does Not Allege an Actionable Misstatement or Omission.

                A.  The Complaint Does Not Allege a Material Misrepresentation Related to the Company's Anti-Counterfeiting Measures.

Defendants urge that the Complaint fails to plausibly allege a material misrepresentation related the Company's anti-counterfeiting measures, and that plaintiffs' Securities Act and Exchange Act claims directed toward the alleged misstatement should be dismissed. For the reasons that will be explained, the motion will be granted.

"Section 11 of the Securities Act prohibits materially misleading statements or omissions in registration statements filed with the SEC." In re Morgan Stanley Info. Fund Sec.

<u>Litig.</u>, 592 F.3d 347, 358 (2d Cir. 2010) (citing 15 U.S.C. § 77k(a)). "To state a claim under section 11, the plaintiff must allege that: (1) she purchased a registered security, either directly from the issuer or in the aftermarket following the offering; (2) the defendant participated in the offering in a manner sufficient to give rise to liability under section 11; and (3) the registration statement 'contained an untrue statement of a material fact or omitted to state a material fact required to be stated therein or necessary to make the statements therein not misleading.'" <u>Id.</u> at 358-59 (quoting 15 U.S.C. § 77k(a)). Section 11 "'imposes strict liability on issuers and signatories, and negligence liability on underwriters,' for material misstatements or omissions in a registration statement." <u>Fed. Hous. Fin. Agency for Fed. Nat'l Mortg. Ass'n v. Nomura Holding Am., Inc.</u>, 873 F.3d 85, 99 (2d Cir. 2017) (quoting <u>NECA–IBEW Health & Welfare Fund v. Goldman Sachs & Co.</u>, 693 F.3d 145, 156 (2d Cir. 2012)).

To state a claim for relief under section 10(b) and Rule 10b-5 promulgated thereunder, a Complaint must allege a material misstatement or omission that caused economic loss in connection with the purchase or sale of a security, among other things. <u>See</u>, <u>e.g.</u>, <u>Singh v. Cigna Corp.</u>, 918 F.3d 57, 62 (2d Cir. 2019). For claims under both the Securities Act and the Exchange Act, an alleged misrepresentation is material if "there is a substantial likelihood that a reasonable person would consider it important" in deciding whether to buy or sell the stock. <u>Id.</u> at 63 (quotation marks omitted). "Such a statement must, in the view of a reasonable investor, have significantly altered the 'total mix' of information made available. The statement must also be misleading, evaluated not only by literal truth, but by context and manner of presentation." <u>Id.</u> at 63 (quotation marks and alteration omitted); <u>see also</u> <u>In re Morgan Stanley</u>, 592 F.3d at 360 ("The definition of materiality is the same for [section 11] as it is under section 10(b) of the Exchange Act . . . .").

As noted, the Complaint alleges that defendants materially misrepresented the

Company's anti-counterfeiting efforts in the following passage of its registration statement:

> Although we have adopted strict measures to protect against
> [liabilities arising from the sale of counterfeits], including
> proactively verifying the authenticity and authorization of products
> sold on our platform through working with brands and conducting
> offline investigations, immediately taking down any counterfeit or
> illegal products or misleading information found on our platform,
> and freezing the accounts of merchants in violation of the platform
> policies, these measures may not always be successful.

(Compl't ¶ 67.) According to plaintiffs, this statement was false and misleading because

Pinduoduo actually "did little" to address counterfeiting, ignored complaints from brands like

Skyworth, performed "desultory" offline investigations, and sold large volumes of counterfeit

goods in certain product categories. (Compl't ¶ 68.) An unnamed former employee in the

Company's quality control department has asserted that employees spot-checked only about 210

total items a day, a "tiny fraction" of the Company's overall sales. (Compl't ¶ 47.) The

Complaint asserts that Pinduoduo became a platform of choice for counterfeiters based on its lax

registration requirements relative to its competitors. (Compl't ¶ 48.)

Other portions of the prospectus contained additional disclosures about the

Company's challenges to fully enforcing intellectual property protections. The prospectus stated

that the Company sold items from 1.7 million merchants. (Fumerton Dec. Ex. B at 22.) It

explained the risks of counterfeiting as follows:

> Under our current marketplace model, all products offered on our
> platform are supplied by merchants, who are separately responsible
> for sourcing the products that are sold on our platform. . . . We have
> been and may continue to be subject to allegations and lawsuits
> claiming that products listed or sold through our platform by third-
> party merchants are counterfeit, unauthorized, illegal, or otherwise
> infringe third-party copyrights, trademarks and patents or other
> intellectual property rights . . . . Although we have adopted strict
> measures to protect us against these potential liabilities, including

proactively verifying the authenticity and authorization of products sold on our platform through working with brands and conducting offline investigations, immediately taking down any counterfeit or illegal products or misleading information found on our platform, and freezing the accounts of merchants in violation of the platform policies, these measures may not always be successful or timely. For example, in January 2018, we were required by the relevant government authorities to strengthen supervision on the qualifications of the distributors of publications on our platform and to respond effectively to claims of copyright infringement.

(Fumerton Dec. Ex. B at 22-23.)  The prospectus also summarized a separate United States-based trademark-infringement action commenced against the Company in July 2018.  (Id. at 23.)  It warned, "In the event that counterfeit, illegal, unauthorized or infringing products are sold on our platform or infringing or misleading content is posted on our user interface, we could face claims or be imposed penalties.  . . .  Potential liabilities under PRC law for negligence in participating or assisting in infringement activities associated with counterfeit goods include injunctions to cease infringing activities, rectification, compensation, administrative penalties and even criminal liability."  (Id.)  "Moreover, the alleged sales of counterfeit products and third-party claims or administrative penalties related to them could result in significant negative publicity and our reputation could be severely damaged."  (Id.)

The prospectus later warned that "the high volume of transactions taking place on our platform as well as publicity about our business create the possibility of heightened attention from the public, regulators and the media."  (Id. at 30.)  In bolded, italicized language, it stated, "***We may increasingly become a target for public scrutiny, including complaints to regulatory agencies, negative media coverage, and malicious reports, all of which could severely damage our reputation and materially and adversely affect our business and prospects.***"  (Id.)

In opposition to the motion, plaintiffs urge that these warnings should be disregarded as mere boilerplate and do not adequately explain the known deficiencies of the

Company's anti-counterfeiting measures. "A generic warning of a risk will not suffice when undisclosed facts on the ground would substantially affect a reasonable investor's calculations of probability. One cannot, for example, disclose in a securities offering a business's peculiar risk of fire, the installation of a comprehensive sprinkler system to reduce fire danger, and omit the fact that the system has been found to be inoperable, without misleading investors." Meyer v. Jinkosolar Holdings Co., 761 F.3d 245, 251 (2d Cir. 2014) (internal citation and quotation omitted).

In Meyer, the issuer's prospectus explained that the company was subject to China's environmental laws, which required costly and labor-intensive compliance, and explained that violations could result in harsh sanctions. Id. at 247-49. However, the prospectus did not disclose that the company had several serious compliance failures related to its discharge of toxic wastewater, which ultimately resulted in major fines, killed nearby livestock and triggered violent protests against the company. Id. at 248-49. Meyer concluded that, while the prospectus was technically true, it gave investors false comfort as to the effectiveness of compliance measures, inviting an overly optimistic assessment of the company's risks. Id. at 250-52. It therefore concluded that the complaint plausibly alleged a section 11 violation. Id.

The facts and disclosures of Meyer differ in significant respects from the allegations made by the plaintiffs in this case. Here, the Company's disclosures depicted its anti-counterfeiting efforts as an ongoing battle, one that was subject of continuing litigation and claims over third-party infringement, including a United States-based trademark action commenced in the same month as the IPO. (Fumerton Dec. Ex. B. at 22-23.) It warned that its anti-counterfeiting measures "may not always be successful" and explained that its 1.7 million

merchants had ultimate responsibility for the sourcing of products. (Compl't ¶ 67 & Fumerton Dec. Ex. B. at 22-23.)

Indeed, the passage that plaintiffs have alleged to be misleading was phrased as an express warning about the potential ineffectiveness of the Company's anti-counterfeiting policies. It explained that "[a]lthough" Pinduoduo had adopted "strict measures" against counterfeiting, "these measures may not always be successful." (Fumerton Dec. Ex. B at 23.) It immediately provided the example of a governmental warning from January 2018 about enforcement of publication copyrights. (Id.) Read in its surrounding context, the language that plaintiffs claim to be misleading was a qualified statement about the effectiveness of its anti-counterfeiting policies, and appears amid disclosures about historical and potential liabilities. A reasonable investor would not understand the Company to be boasting that it had significantly thwarted the market for counterfeits. Rather, the Company was warning investors that counterfeit goods might still be sold through the platform, despite the Company's enforcement efforts. A reasonable investor who read the offering documents would have understood that counterfeiting remained an ongoing problem for the Company, and that the high volume of merchants and sales on the platform were an obstacle to enforcement. "Such framing suggests caution (rather than confidence) regarding the extent of [the Company's] compliance." Singh, 918 F.3d at 64.

The Court therefore concludes that the Complaint does not plausibly allege a misrepresentation or omission in the Company's registration statement as to its anti-counterfeiting measures. The motion to dismiss plaintiffs' claims directed toward this purported misrepresentation is therefore granted.

B. The Complaint Does Not Allege a Material Misrepresentation Related to the Company's Marketing Expenses.

Defendants also urge that plaintiffs have failed to plausibly allege a material misrepresentation or omission related to the Company's marketing expenses, and that their claims directed toward marketing expenses should be dismissed. For the reasons that will be explained, the defendants' motion will be granted.

According to the Complaint, Pinduoduo's business model requires the low-cost acquisition of new customers. (Compl't ¶ 74.) The registration statement touted the Company's "team purchase" model, where consumers made group purchases directly through the Pinduoduo platform or over social networks. (Compl't ¶ 78.) It stated:

As a result, buyers on our platform actively introduce us to and share products offered on our platform and their shopping experiences with their friends, family and social contacts. New buyers in turn refer our platfrom [sic] to their broader family and social networks, generating low-cost organic traffic and active interactions and leading to exponential growth of our buyer base. In the twelve-month periods ended December 31, 2017 and June 30, 2018, the number of active buyers on our platform reached 245 million and 344 million, respectively.

(Compl't ¶ 78.) The registration statement also stated as follows:

Our sales and marketing expenses increased from RMB73.9 million in the three months ended March 31, 2017 to RMB1,217.5 million (US$194.1 million) in the three months ended March 31, 2018, while sales and marketing expenses as a percentage of our revenues decreased from 199.5% in the three months ended March 31, 2017 to 87.9% in the three months ended March 31, 2018.

(Compl't ¶ 81.)

The Complaint asserts that the Company omitted material information about its marketing expenses from the second quarter of 2018. According to the Complaint, Pinduoduo's interim financial results for the second quarter of 2018 "sharply differed from the existing trends

- 15 -

as Pinduoduo engaged in a massive but fruitless marketing campaign," with marketing expenses jumping from RMB 1,217,458 to RMB 2,970,734. (Compl't ¶ 83.) At the same time, the number of new users only increased from 25.2 million to 28.8 million, with the per-user acquisition costs going from RMB 24 to RMB 64. (Compl't ¶ 83.)

The Complaint alleges that the increased customer-acquisition costs were a trend known to the Company that should have been disclosed under Item 303 of Regulation S-K. Item 303 of SEC Regulation S-K, 17 C.F.R. § 229.303, requires disclosure of trends and uncertainties that may affect a company. To plausibly allege a violation of Item 303, a plaintiff must identify a trend that "was already known and existing," and allege that "the trend or uncertainty . . . was reasonably likely to have a material impact" on the registrant's financial condition. Litwin v. Blackstone Grp., L.P., 634 F.3d 706, 716 (2d Cir. 2011).

"[F]ailing to comply with Item 303 by omitting known trends or uncertainties from a registration statement or prospectus is actionable under Sections 11 and 12(a)(2) of the Securities Act of 1933." Stratte-McClure v. Morgan Stanley, 776 F.3d 94, 101 (2d Cir. 2015). "Item 303's disclosure obligations, like materiality under the federal securities laws' anti-fraud provisions, do not turn on restrictive mechanical or quantitative inquiries." Panther Partners Inc. v. Ikanos Communications, Inc., 681 F.3d 114, 122 (2d Cir. 2012). The Second Circuit has identified actionable Item 303 violations when a company is silent about the known threats posed by a trend or uncertainty. See, e.g., Litwin, 634 F.3d at 718-19 (actionable failure to disclose how national deterioration of the real-estate market could affect registrant's vast real-estate portfolio); Indiana Pub. Ret. Sys., 818 F.3d at 95-96 (actionable failure to disclose acts of employee fraud that jeopardized existing and future contracts).

In determining whether an omission plausibly violates the securities laws, courts consider "whether there is 'a substantial likelihood that the disclosure of the omitted [information] would have been viewed by the reasonable investor as having significantly altered the 'total mix' of information made available.'" Stadnick v. Vivint Solar, Inc., 861 F.3d 31, 37 (2d Cir. 2017) (quoting DeMaria v. Andersen, 318 F.3d 170 (2d Cir. 2003)). "The materiality of an omission must be assessed in light of the total mix of information in the public domain." Id. at 38.

The prospectus reported year-end sales-and-marketing expenses for 2016 (approximately RMB 169 million) and 2017 (approximately RMB 1.34 billion) and for the first quarter of 2018 (approximately RMB 1.22 billion). (Fumerton Dec. Ex. B at 22.) It also compared the first quarter of 2017 (approximately RMB 74 million) to the first quarter of 2018 (approximate RMB 1.2 billion), which showed a sixteen-fold increase in sales and marketing expenses over the course of a year. (Id.) The prospectus warned in no uncertain terms, "Our results of operations depend on our ability to manage our costs and expenses. We expect our costs and expenses to continue to increase as we grow our business and attract more buyers and merchants to our platform." (Prospectus at 82.)[1] It further disclosed that "[i]f we continue to incur substantial marketing expenses without being able to achieve anticipated buyer and merchant growth, our operating results may be materially and adversely affected. As a result we may fail to improve our operating margin and may continue to incur net losses in the future." (Fumerton Dec. Ex. B at 21.) It further informed investors that "[o]ur ability to achieve profitability depends on our ability to, among other things, increase our number of active buyers,

---

[1] The Fumerton Declaration annexes excerpts of the Company's offering documents. The full text of the prospectus can be accessed at https://www.sec.gov/Archives/edgar/data/1737806/000104746918005204/a2236308z424b4.htm.

grow and diversity our merchant base, and optimize our cost structure. We may not be able to achieve any of the above." (Id.)

The second quarter ended on June 30, 2018, and the IPO was launched on July 26, at which point the registration statement became effective. The Complaint alleges that "[a]ccording to several employees, Pinduoduo had access to full financial reports for [the second quarter] on or before July 14, 2018. . . ." (Compl't ¶ 6.)[2] The Complaint does not reveal by whom second quarter figures were compiled nor to whom they were communicated. It does not reveal whether these figures were audited or were later subject to significant revision. Plaintiffs cite no SEC requirement or guidance that quarterly results for the second quarter should have been reflected in the registration statement or that the public offering should have been delayed until they were available.[3] A reasonable investor knew that the presented data reflected sales and marketing expenses through the end of the first quarter. A reasonable investor also knew the trend of the Company's sales and marketing expenses, and that trend reflected a sixteen-fold increase year-over-year.

The Court concludes that the Complaint does not plausibly allege a violation of the securities laws based on the absence of an Item 303 disclosure about the preceding financial quarter's marketing expenses. Pinduoduo's prospectus disclosed that its operating expenses had "increased substantially" based "primarily" on its sales and marketing expenses. (Fumerton Dec. Ex. B at 89.) It stated that, over the course of a year, quarterly marketing expenses rose from

---

[2] Elsewhere the Complaint alleges that Q2 results were known by July 11 "at the latest." (Compl't ¶117.)
[3] Generally, depending on the size of the public float, companies that are already public have 40 to 45 days from the close of a quarter to report on results. SEC General Instructions to Form 10Q, at https://www.sec.gov/files/form10-q.pdf; 17 CFR § 240.13a-13; 17 CFR § 240.15d-13; see also In re Duane Reade Inc. Sec. Litig., 2003 WL 22801416, at *5 (S.D.N.Y. Nov. 25, 2003) ("despite plaintiffs' urging to the contrary, there is no obligation to release interim sales data prior to a quarter's end.") (Buchwald, J.).

RMB 73.9 million to RMB 1,217.5 million.  (Id.)  It warned that if Pinduoduo "continued to incur substantial marketing expenses" without corresponding growth, "operating results may be materially and adversely affected," and the Company would continue to incur net losses.  (Id. at 21.)  A reasonable investor would have understood that over the preceding year, the Company's marketing expenses had grown by a multiplier of sixteen (which would reflect an average doubling of expenses every quarter), that the Company could continue to incur substantial marketing expenses, and that the Company could be materially and adversely affected if its marketing efforts did not expand its customer base.  Pinduoduo provided purchasers with "ample warnings and disclosures" about the growth of marketing expenses.  Stadnick, 861 F.3d at 39, 37.  The doubling of marketing expenses in the second quarter of 2018 is consistent with the trend disclosed by the Company, and the Complaint does not explain how further disclosure would have significantly altered the total mix of information available to a reasonable investor or disclosed a trend not otherwise explained in the offering documents.  See id.

The Complaint's reliance on Item 303 of Regulation S-K does not alter the analysis.  When a company's offering documents include "repeated warnings" about a specific business vulnerability, there is "no basis" to conclude that the company failed to fulfill its affirmative disclosure obligations under Item 303.  Id. at 39-40.  Pinduoduo's disclosures left no doubt that its sales and marketing expenses had grown exponentially, that they could continue to grow, and that the Company could be materially and adversely affected if its customer growth failed to keep pace.

Because the Complaint does not plausibly allege that defendants materially misrepresented or omitted facts related to the Company's marketing expenses, defendants' motion to dismiss the claim will be granted.

C. Plaintiffs' Claims of Control Person Liability Are Also Dismissed.

Because the Complaint does not adequately allege a primary violation under section 11 of the Securities Act or section 10(b) of the Exchange Act, its claims of control-person liability under section 15 and 20(a) of the two respective acts will also be dismissed.  See, e.g., Rombach, 355 F.3d at 177 (dismissing claims of control-person liability when complaint fails to allege a primary violation).

II.     The Exchange Act Claims Are Separately Dismissed because the Complaint Does Not Allege Scienter.

Plaintiffs' claim under section 10(b) and Rule 10b-5 will also be dismissed for the separate and additional reason that the Complaint fails to allege scienter with the particularity required by Rule 9(b) and the PSLRA.

As previously noted, a plaintiff may satisfy the scienter requirement "by alleging facts (1) showing that the defendants had both motive and opportunity to commit the fraud or (2) constituting strong circumstantial evidence of conscious misbehavior or recklessness."  ATSI, 493 F.3d at 99.  The court must weigh plausible supporting inferences, see id., and the Complaint must allege with particularity facts that raise a "strong inference" that defendants consciously and recklessly omitted or misrepresented information.  Indiana Pub. Ret. Sys., 818 F.3d at 93. This may be satisfied "with allegations constituting strong circumstantial evidence" of defendants' intent.  Kalnit v. Eichler, 264 F.3d 131, 138-39 (2d Cir. 2001).  The "inference of scienter must be more than merely plausible or reasonable – it must be cogent and at least as compelling as any opposing inference of nonfraudulent intent."  Tellabs, 551 U.S. at 314.

Plaintiffs in this case urge that defendants consciously and recklessly misrepresented and omitted material information, and do not assert a motive and opportunity to commit fraud.  When plaintiffs advance a recklessness-based theory of scienter, they "must show

that they alleged reckless conduct by the [defendants], which is 'at the least, conduct which is highly unreasonable and which represents an extreme departure from the standards of ordinary care to the extent that the danger was either known to the defendant or so obvious that the defendant must have been aware of it.'" Kalnit, 264 F.3d at 142 (quoting Honeyman v. Hoyt, 220 F.3d 36, 39 (2d Cir. 2000)); see also S. Cherry St., LLC v. Hennessee Grp. LLC, 573 F.3d 98, 109 (2d Cir. 2009) ("By reckless disregard for the truth, we mean conscious recklessness – i.e., a state of mind approximating actual intent, and not merely a heightened form of negligence. In elaborating as to what may constitute recklessness in the context of a private securities fraud action, we have referred to conduct that at the least is highly unreasonable and which represents an extreme departure from the standards of ordinary care to the extent that the danger was either known to the defendant or so obvious that the defendant must have been aware of it.") (emphasis in original; citations, quotation marks and alterations omitted).

In urging that the Complaint adequately alleges scienter as to its counterfeiting-based claim, plaintiffs assert that Pinduoduo knew that it had not adequately checked for the authenticity of the products sold on its platform, and points to the deterioration of its business relationship with Skyworth. It urges that the sales of counterfeit goods fueled the Company's growth, thus giving it an incentive to take a lax approach to enforcement.

Such assertions fall far short of "strong circumstantial evidence" of a reckless state of mind approximating actual intent. Kalnit, 264 F.3d at 138-39. The Company's description of its "strict" anti-counterfeiting measures was accompanied by the qualification that its efforts "might not always be successful," a recitation of the Company's potential liabilities, and descriptions of claims and actions previously asserted against it. The offering documents did not conceal or sugarcoat the Company's historical and ongoing struggle to deal with counterfeit

goods.  Plaintiffs posit that the Company benefited from the sales growth reflected by trafficking in counterfeit goods, but they do not articulate why such an inference is more cogent and compelling than a competing inference that counterfeit sales were harming the Company by exposing it to liability to customers, brands and governments and tarnishing its reputation in the marketplace.  <u>Tellabs</u>, 551 U.S. at 314.  Assuming <u>arguendo</u> that the Complaint had adequately alleged a material misrepresentation about the Company's anti-counterfeiting measures, it does not include factual allegations raising a cogent and compelling inference of scienter, but rather, that "defendants were in a constant game of 'Catch up'—acknowledging the company's material weaknesses and disclosing their continued efforts to resolve them, only to learn of yet more."  <u>In re Magnum Hunter Res. Corp. Sec. Litig.</u>, 616 Fed. App'x 442, 445 (2d Cir. 2015) (summary order) (quotation marks omitted).

Similarly, the Complaint does not raise a cogent and compelling inference that defendants acted with a reckless intent by omitting the marketing expenses incurred in the second quarter of 2018.  Plaintiffs rely on an account from "Former Employer 4," an accountant who previously worked for one of the Company's subsidiaries, who has stated that the Company would have had access to data on its quarterly and monthly marketing expenses in advance of the IPO.  (Compl't ¶ 119.)  But the Complaint does not assert that management or any specific defendant should reasonably have been aware of those expenses, explain the basis for the knowledge of Former Employee 4, or assert that the former employee had any knowledge or connection to the marketing expenses in the second quarter of 2018.  Plaintiffs also do not explain why it was an extreme departure from the standards of ordinary care to omit interim quarterly data about marketing expenses that reflected a growth rate consistent with the growth in expenses that was disclosed for the preceding year.

The Complaint's claims under the Exchange Act are therefore dismissed for the separate reason that the Complaint does not set forth facts that raise a cogent and compelling inference of scienter.

CONCLUSION.

Defendants' motion to dismiss is granted in its entirety. (Docket # 50.)

The Clerk is directed to terminate the motion, enter judgment for the defendants and close the case.

SO ORDERED.

P. Kevin Castel
United States District Judge

Dated: New York, New York
March 30, 2020